IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| Judekenneth Maduka Orji | * |
| | * |
| Plaintiff, | * Case No.: 8:-23-cv-02986 LKG |
| | * Jury Trial Requested |
| VS. | * |
| | * |
| Citadel Securities LLC, et al. | * |
| | * |
| Defendants. | * |
| | * |

************************************************************************

## SECOND AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

### THE NATURE OF THE CASE

NOW COMES the Plaintiff, Judekenneth Maduka Orji, by and through the

undersigned counsel, G. Emeka Onwezi, and alleges against the above-captioned defendants and states as

follows:

1.      This case arises from a conspiracy, cyber-hacking, fraud, breach of contract and anticompetitive

scheme by Market Makers1 or Market Participants of the New York Stock Exchange ("NYSE"), The

Chicago Board Options Exchange ("CBOE"), The Nasdaq Stock Exchange ("NASDAQ"), and other stock

exchanges, who are named herein as Defendants Citadel Securities LLC; Goldman Sachs & Co., LLC;

GTS Securities LLC; Virtu Americas LLC, Canaccord Genuity, Inc.; Susquehanna Securities, Inc.; Cowen

& Company, LLC; Robert W. Baird & Co., Inc.; IMC Chicago, LLC, LLC; Latour Trading LLC; G1

Execution Services LLC; Cantor Fitzgerald & Co.; Two Sigma Securities, LLC; SG American Securities,

LLC; Morgan Stanley & Co, LLC; J. P. Morgan Securities, LLC; Clear Street, LLC; Stifel, Nicolaus &

Co., Inc.; Wells Fargo Securities, LLC; William Blair, LLC a/k/a William Blair & Co., LLC; UBS

Securities, LLC; Keefe, Bruyette & Woods, Inc.; BOFA Securities, Inc.; Maxim Group, LLC; Keybanc

---

[1] A market maker is "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers." Securities Exchange Act of 1934, Rule 15c3-1(c)(8), 17 C.F.R. § 240.15c3-1(c)(8).

Capital Markets, Inc.; StoneX Financial Inc.; PUMA Capital, LLC; HRT Financial LP; Flow Traders US Institutional Trading LLC; and Wolverine Trading, LLC (collectively "MM Defendants") to hack into and access Plaintiff's computers, mobile phones, e-mail addresses, text messages, network router and electronic devices ("Personal Devices") without authorization, stalk and monitor Plaintiff on these devices, obtain financial records, steal passwords and access brokerage accounts to obtain details of portfolio securities, and deceive and defraud Plaintiff by fixing, paralleling, manipulating the quotations and prices of the securities, causing over one million dollars ($1,000,000) in damages from September 1, 2021, through the present ("Relevant Period"). Screenshots and video recordings of NASDAQ and NYSE platforms, and NasdaqTrader.com revealed the names of the MM Defendants.

2.      Nasdaq and NYSE rules obligate the MM Defendants to provide Bid/Ask price quotations on the Relevant Securities between the hours of 9.30 a.m. to 4.30 p.m. According to Defendant Citadel Securities LLC, "Market makers participate in the market at all times, buying securities from sellers and selling securities to buyers."[2] Acting in concert with one another and other unknown co-conspirators, the MM Defendants executed the illegal scheme by stalking Plaintiff's online activities and  using their privileges as market makers to match Plaintiff's activities to his identity, sending phishing emails with malware and spyware programs that allowed them access to his home network and every electronic device connected to its WiFi, stalking and monitoring the devices, obtaining his brokerage account login details and accessing the accounts for details of portfolio securities, coordinating to control, manipulate, and artificially fix the price quotation of the securities, especially in four stocks: Lordstown Motors, Inc. ("RIDE/RIDEQ") later rebranded post-bankruptcy as Nu Ride Inc with the ticker NRDE, Ashford Hospitality Trust, Inc. ("AHT"), Multiplan Corporation, Inc. ("MPLN"), and Genius Group, Inc. ("GNS") ("Relevant Securities"), and engaging in a combination of manipulative  trades and quotations, in order to create losses, inflict financial

---

[2] See, https://www.citadelsecurities.com/what-we-do/what-is-a-market-maker/#:~:text=. See also, "Citadel Securities: What is a Market Maker," in www.YouTube.com/watch?v=j-T8dVLPXmg&t=67s.

hardship and emotional distress, and deceive brokers to issue margin calls and forcefully liquidate the securities. .

3.      Lordstown Motors filed for bankruptcy protection on June 27, 2023, following inability to raise money as a result, in part, to the massive shorting and manipulation of the shares pursuant to the fraudulent scheme.[3] MM Defendants Citadel, Susquehanna, G1 Execution, VIRTU, Canaccord, and others followed the stock as market makers into the OTC Market, and continued the fraudulent scheme using CBOE facilities. They continued the fraud after it emerged from bankruptcy on March 14, 2024, as Nu Ride Inc (NRDE). An investor wrote about Defendant GTS manipulation on Stocktwits on March 19, 2024.

4.      The scheme described herein were authorized, ordered or performed by MM Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of MM Defendants' businesses or affairs. The objective was to intimidate and defraud Plaintiff. The MM Defendants acted as agents of each and one another and are jointly and severally liable for the damages caused to Plaintiff.

5.      MM Defendants' conspiracy, computer fraud, anti-competitive activities, and manipulative scheme violated the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), as well as Rule 10b-5(a) & (c), 17 C.F.R. §§ 240.10b-5(a) & (c) promulgated thereunder4; the Computer Fraud and Abuse Act (CFAA) §§ a (2) & (4), 18 U.S.C. §§ 1030(a)(2) & (4); the Sherman Antitrust Act ("Sherman Act") § 1; 15 U.S.C. § 1; constituted intentional invasion of Plaintiff's right to privacy, and intentional infliction of emotional distress under Maryland State law.

6.      Further, the Plaintiff is suing Defendant Webull Financial, Inc., ("Defendant Webull"), who breached the brokerage contract and violated its obligations as a broker-dealer[5] among other things, by

---

[3] Defendant Citadel reported over 700,000 RIDE short position in 2021 soon after Plaintiff initiated position. Others such as Goldman Sachs and Morgan Stanley reported similar positions, repeatedly urging investors to sell RIDE.
[4] The manipulative scheme also contravenes Exchange Act Rule 11b-1(a)(2)(ii)(iii), 17 C.F.R. § 240.11b-1(a)(2)(ii)(iii) (which requires market makers to maintain a "fair and orderly market" for investors). In addition, the scheme violated NASDAQ Rule 782, which prohibits manipulative operations; and Rule 1014(a), which prohibits market makers from making bids or offers that are inconsistent with the maintenance of a fair and orderly market.
[5] Defined in 15 U.S.C. 78c(a)(4) & (5).

negligently providing unreasonable, unprofessional and unethical brokerage services, false account values, misleading information, and failed to monitor, investigate, and follow Financial Industry Regulatory Authority, Inc. ("FINRA")/industry guidelines after being aware that the account was compromised[6], breached its fiduciary duty to Plaintiff by engaging in self-dealing and using deceptive devices to induce transactions and sell away assets, deceived and defrauded Plaintiff and prevented him from de-risking the portfolio by committing to investigate the manipulation while not having any intention and capacity to do so, breached commitment and retaliated against Plaintiff after he demanded an audit, converted account assets and refused to return them when Plaintiff so demanded. Defendant Webull's actions violated Exchange Act § 10(b), 15 U.S.C. § 78j(b), as well as Rule 10b-5(b) & (c), 17 C.F.R. §§ 240.10b-5(b) & (c), constituted professional negligence, Violation of the Restatement (Second) of Torts § 552 "Information Negligently Supplied for the Guidance of Others," breach of fiduciary duty, breach of contract, fraud, intentional misrepresentation, and intentional infliction of emotional distress under Maryland State law.

JURISDICTION AND VENUE

7.      This United States District Court for the District of Maryland ("the District") has subject matter jurisdiction pursuant to the Exchange Act § 27, 15 U.S. C. § 78aa and has jurisdiction over the CFAA claims pursuant to 28 U.S.C. § 1331. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the Maryland State Law claims pursuant to 28 U.S.C § 1367. The Court has jurisdiction to award treble damages for the antitrust injury pursuant to the Clayton Act, § 4, 15 U.S.C § 15.

8.      This Court has personal jurisdiction over each defendant because they transact substantial business in the District and throughout the United States either through the Internet or physical presence.

---

[6] See FINRA: (1) Customer Information Protection in https://www.finra.org/rules-guidance/key-topics/customer-information-protection, and (2) Checklist for Compromised Accounts in https://www.finra.org/rules-guidance/key-topics/customer-information-protection/firm-checklist-compromised-accounts.

Defendants accessed Plaintiff's Personal Devices located in this District, and/or directed their fraudulent activities against Plaintiff, a resident of this District.

9.      Venue is proper in the District of Maryland pursuant to 28 U.S C. § 1391 and 15 U.S. Code § 78aa because the fraud and violations occurred in the District and all defendants directly or indirectly used the means of interstate commerce and communication, including facilities of national securities exchanges, the Internet, email system, and telephones, all of which had effect in this District.

## PARTIES

10.     Plaintiff is a resident of Prince Georges' County, Maryland.

11.     Webull Financial, LLC ("Defendant Webull"), is a broker-dealer incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and transacts business throughout the United States. Its FINRA Broker Check Report states that it was registered and approved to conduct business in Maryland on 1/26/2018. Plaintiff opened account number 5NC-45514-10 in November 2020. In an email dated 3/29/2022, Defendant Webull informed Plaintiff that "there are no arbitration agreements or other documents related to the resolution of your account issues."

12.     Citadel Securities LLC ("Citadel"), was incorporated under the laws of the State of Delaware, has principal place of business in the State of Florida, and does business in the State of Maryland.

13.     Goldman Sachs & Co. LLC ("Goldman Sachs"), was incorporated under the laws of the State of New York, has principal place of business in New York, and does business in the State of Maryland.  On October 22, 2020, Goldman Sachs admitted criminal responsibility for its role in an international corruption scheme and agreed to pay $2.9 billion in restitution.

14.     GTS Securities LLC ("GTS"), was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

15.     VIRTU Americas LLC ("VIRTU"), was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

16.     Canaccord Genuity, Inc. ("Canaccord"), was incorporated under the laws of the State of New York, has principal place of business in New York, and does business in the State of Maryland.

17.     Susquehanna Securities, Inc, was incorporated under the laws of the State of Delaware, has principal place of business in the State of Pennsylvania, and does business in the State of Maryland.

18.     Cowen & Co. LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

19.     Robert W. Baird & Co. Inc., was incorporated under the laws of the State of Wisconsin, has principal place of business in Wisconsin, and does business in the State of Maryland.

20.     IMC Chicago, LLC, was incorporated under the laws of the State of Illinois, has principal place of business in Illinois, and does business in the State of Maryland.

21.     Latour Trading LLC was incorporated under the laws of the State of Delaware, with principal place of business in the State of New York, and does business in the State of Maryland.

22.     G1 Execution Services LLC, was incorporated under the laws of the State of Illinois, has principal place of business in Illinois, and does business in the State of Maryland.

23.     Cantor Fitzgerald & Co., was incorporated under the laws of the State of New York, has principal place of business in New York, and does business in the State of Maryland.

24.     Two Sigma Securities, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

25.     SG Americas Securities LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

26.     Morgan Stanley & Co., was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

27.     J.P. Morgan Securities, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

28.     Clear Street, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

29.     Stifel, Nicholas & Co. Inc., was incorporated under the laws of the State of Missouri, has principal place of business in Missouri, and does business in the State of Maryland.

30.     Wells Fargo Securities, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of North Carolina, and does business in the State of Maryland.

31.     William Blair, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of Illinois, and does business in the State of Maryland.

32.     UBS Securities, LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

33.     Keefe, Bruyette & Woods, Inc., was incorporated under the laws of the State of New York, has principal place of business in New York, and does business in the State of Maryland.

34.     BOFA Securities, Inc., was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

35.     Maxim Group, LLC, was incorporated under the laws of the State of New York, has principal place of business in New York, and does business in the State of Maryland.

36.     Keybanc Capital Markets, Inc., was incorporated under the laws of the State of Ohio, has principal place of business in Ohio, and does business in the State of Maryland.

37.     StoneX Financial, Inc., was incorporated under the laws of the State of Florida, has principal place of business in Florida, and does business in the State of Maryland.

38.     PUMA Capital, LLC, was incorporated under the laws of the State of Florida, has principal place of business in the State of New York, and does business in the State of Maryland.

39.     HRT Financial LP, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

40.     Flow Traders U.S. Institutional Trading LLC, was incorporated under the laws of the State of Delaware, has principal place of business in the State of New York, and does business in the State of Maryland.

41.     Wolverine Trading, LLC, was incorporated under the laws of the State of Illinois, has principal

place of business in Illinois, and does business in the State of Maryland.

SUBSTANTIVE ALLEGATIONS

42.     Plaintiff is an attorney and an unsophisticated investor. Plaintiff participated in Internet finance

forums, including, Yahoo Finance, Google Finance, Investors' Hub, and Stocktwits. Participants chat

about stocks and frequently post about manipulation by market makers and hedge funds. Plaintiff

participated actively in these discussions. Based on personal knowledge and belief, the MM Defendants

identified Plaintiff through these forums, followed his discussions, and conspired to target and manipulate

his portfolio in order to punish him for his views, deceive and defraud him.

43.     In several chats on Investors' Hub and Yahoo Finance, Plaintiff posted the details of his stock

purchases, including the time stamp. Plaintiff believes that the MM Defendants matched and associated

these online posts to his identity using their privileges to such information. Prior to the Relevant Period,

Plaintiff noticed that his portfolio transactions were being stalked. The stalking occurred in Plaintiff's

transactions in several stocks, including the Relevant Securities. Plaintiff did not understand who was

attacking his portfolio and how they were able to execute the fraud, he filed a complaint with the SEC in

File # 1013149 seeking an investigation. Unsure of the culprits, Plaintiff even mentioned the exchanges as

possible suspects in the complaint. After Plaintiff posted about the SEC complaint on Yahoo Finance, the

stalking intensified, forcing him to stop posting the details of his stock transactions online. At that point,

Plaintiff believes that the MM Defendants willfully conspired and embarked on a scheme to obtain

ongoing details of his portfolio and financial transactions by illegally accessing his Personal Devices,

among other things, to stalk and monitor his activities,  obtain user names and passwords to access and

obtain financial records and specific details of his brokerage accounts, use the data to fix quotations,

gamify prices, trade in lockstep, and manipulate the Relevant Securities in order to create losses and

defraud him.

44.     In September 2021, Plaintiff's portfolio in the Webull accounts consisted of: RIDE (52,736 shares), AHT (13,501 shares), MPLN (9,401), AIV (100 shares), GSAT (150), and 200 GREE (200 shares). Plaintiff bought some positions on margin and sold Call Options against all positions. Plaintiff sold short the following options symbols/cusips as Covered Calls: (1) AHT = 9SCKPQ8, 9SDPKC9, 8K57306, 9NCRLY8, 9NMHHB7, 8K57217; (2) RIDE = 8PHTFL1, 9PHTFL7, 9PHTFL9, 9PHTFM1, 9KFHZB0, 9SBFNQ5; (3) MPLN = 9G93110 ("Relevant Options Symbols/Cusips"). Plaintiff held some of the same stocks in TD Ameritrade and TradeStation brokerage accounts.

MM DEFENDANTS OBTAINED ACCESS INTO PLAINTIFF'S DEVICES

45.     On or about September 7, 2021, Plaintiff received email and text messages purporting to be from Google, Inc., to use a certain code to reset the password of his gmail, Kenorji@gmail.com. Kenorji@gmail.com is the email address used in his brokerage accounts, and he did not make the requests. The email requested Plaintiff to click on an embedded link if he did not make the request. Plaintiff clicked the link. Plaintiff later received an email from a cloned account, Kenorji105@gmail.com, stating that Kenorji@gmail.com was made a recovery email for the clone. The new email also asked Plaintiff to click on an embedded link if he did not make the request. Again, Plaintiff clicked on the link. Plaintiff received similar messages over the next few days including emails to reset his Facebook and Ebay account passwords. Plaintiff received multiple similar messages from January and February of 2022 after he reset his passwords. Plaintiff later learned that the unknown emails were used to "phish" and gain access into his home network and Personal Devices. A computer forensic expert hired by Plaintiff stated that the actors did not have to leave their footprints in the hardware devices in order to accomplish the fraud. Subsequent events described in the succeeding paragraphs relating to the stalking, monitoring and manipulation of Plaintiff's devices and brokerage account portfolio clearly indicated that the MM Defendants and their agents were responsible for the cyberattack. Plaintiff did not know this fact at that time, no one could have remotely imagined that US Market Makers would engage in such illegal activity. After accessing the email, the MM Defendants created multiple profiles that maintained their access to the

account, including "Experimental Globe175," that used a skull and cross-bones symbol. A forensic audit of Plaintiff's computers found that email addresses of Plaintiff's family members, including his ten-year-old son's email, were also cloned, including rgboman@gmail.com and nilpower.grey@gmail.com. The audit also found malware files.  Plaintiff strongly believes that the MM Defendants and their agents created and used the phishing emails, cloned email accounts, death-themed profiles, and malware files to access and maintain access to his network and Personal Devices, steal all passwords and login details with which they accessed his brokerage accounts and obtained the exact details of the portfolio securities with which they executed the fraudulent scheme against him. FINRA has recognized and warned that the method used by the MM Defendants is used by "unauthorized persons", especially for firms such as Defendant Webull that "offer online, Web-based access to trading platforms and customer account information" to gain "access to a customer account and either steals available assets or misuses the account to manipulate the market." This was exactly what the MM Defendants did. "Intrusions are generally accomplished through the theft of the login credentials of a customer or firm employee. Accounts have also been breached through fake electronic instructions (e.g, email requests…).[7] After Plaintiff got a new Google Pixel phone and T-Mobile home modem in August 2023 while trying to hide away from the MM Defendants, they sent another phishing email and began accessing the new devices. Plaintiff used the Google Pixel location feature and saw that the phone was being accessed from Singapore. Plaintiff was alarmed and reset the brand-new Google Pixel, however, the MM Defendants altered the phone and disabled the location feature. Plaintiff later learned that Defendant Citadel had the only office outside the United States in Singapore. Plaintiff strongly believes that the MM Defendants used Defendant Citadel's Singapore office to access his Personal Devices in August 2023.

46.     Plaintiff used his mobile phone to monitor stocks in his portfolio through a watchlist application from his Tradestation brokerage account ("Watchlist"). The Watchlist is a blank template that account holders input stocks that they want to track and monitor. If the template was modified, the modified input

---

[7] See FINRA: Customer Information Protection in https://www.finra.org/rules-guidance/key-topics/customer-information-protection.

became private to the brokerage account and known only to the account holder or someone with access to it. Plaintiff created his Watchlist with RIDE as the first stock, followed by AHT, MPLN, AIV, GSAT, and later, GREE, in that order. The Watchlist contained sixteen stocks in total. During regular trading session on or about September 8, 2021, Plaintiff observed that all price quotation on RIDE, AHT, MPLN, and AIV abruptly disappeared with the columns grayed out on the Watchlist. The other twelve stocks in the application displayed the usual prices. After shutting down and reopening the Watchlist several times, the price quotations reappeared. The Relevant Securities are quoted either on the Nasdaq or the NYSE. The MM Defendants are the only members obliged by Nasdaq and NYSE Rules to continuously maintain Bid/Ask quotations during regular trading sessions. Plaintiff believed that the MM Defendants coordinated to drop price quotations on the Relevant Securities in furtherance of the fraudulent scheme targeting him. The MM Defendants repeated the manipulation several times in response to Plaintiff's computer and portfolio activities, including for GNS stock on January 11, 2024.

MM DEFENDANTS USED THE OPTIONS SYSTEM TO DEFRAUD PLAINTIFF

47.     After obtaining Plaintiff's brokerage account details which had call options sold against every long position, the MM Defendants exploited and used the options system to defraud him. Upon information, the options system sets options prices using a variety of methods, including the midpoint of the bid/ask prices quoted by the MM Defendants. If no bid prices were quoted, the midpoint would be based on any asking price set by the MM Defendants. For an account such as Plaintiff's with options positions that were sold short, a rise in options price reduces the account balance commensurately. If the positions were held on borrowed margin funds, a manipulator with details of the portfolio and the financial position of the account holder could use the options system to artificially control the account balance with the motive to trigger margin calls on the account. Upon information, brokerage firms routinely recalculate and reset the account balances at the beginning of the trading day where the options prices were established by the quotation system beyond the actual price range. With their access to Plaintiff's accounts, the MM Defendants knew that Defendant Webull's technology was not properly

calculating the account balances. The MM Defendants used their options quotation privilege to target the Relevant Options Symbols/Cusips, control, and manipulate the Webull portfolio.

48.     As shown in the succeeding paragraphs, the MM Defendants would calculate the sum of losses to impose on Plaintiff's portfolio values in furtherance of their scheme. They would set an artificial asking price on the Relevant Options Symbols/Cusips to generate the loss. The options system would automatically access an artificial price for the options based on the midpoint of the asking price set by the MM Defendants. The increased price would create artificial losses on the portfolio by reducing or eroding portfolio values. On the days when the stocks in the portfolio were trading higher and the options were actively traded, such as on December 30, 2021, the MM Defendants would coordinate to place higher bids on those specific call options to increase their prices beyond the dollar amount Plaintiff collected as premium when he sold the options. Market Makers are the only investors permitted to short and hold options securities long at the same time. In either case, the objective of the MM Defendants was to erode portfolio values beyond margin maintenance thresholds and/or to create losses. The MM Defendants used this manipulative pattern to schematically erode the portfolio values of the Defendant Webull account and reap economic benefits as the Defendant Webull improperly and fraudulently liquidated the securities relying on its faulty technology.

49.     On September 15, 2021, Plaintiff downloaded the Webull desktop application to his computer and started using it to monitor the portfolio. At 9.30.04 a.m., the total account value (TAV) was $140,434.54. At 9.30.05 a.m., the TAV was sold down to $51,315.19, with $-115,668.87 in losses. The stocks in the account had barely moved, which meant that the Relevant Options Symbols/Cusips was used to manipulate the account values. The MM Defendants were market makers in the stocks. The MM Defendants created, controlled and traded the Relevant Options Symbols/Cusips. Evidence would show that the MM Defendants used the Relevant Options Symbols/Cusips to manipulate Plaintiff's portfolio values in furtherance of their motive to defraud Plaintiff.  The MM Defendants would continue to use their privileges as market makers to artificially set the Bid/Ask price quotation of the Relevant Options

Symbols/Cusips to control and schematically erode the Webull portfolio balance until the Defendant Webull improperly sold it out on January 27, 2022.

## MM DEFENDANTS COORDINATE TO GAMIFY AND FIX PRICES OF SECURITIES IN PLAINTIFF'S PORTFOLIO AND TRADE THEM IN LOCKSTEP

50.     Throughout the Relevant Period, Plaintiff monitored his portfolio by creating Watchlists and or Stock Monitors in various personal devices such as phones, computers, and tablets. From 2021 through 2022, Plaintiff used a Watchlist in his TradeStation Securities brokerage account that contained sixteen stocks. Only four of the stocks were in Plaintiff's portfolio. Plaintiff observed that the pricing of the Bid/Ask for four stocks that were in his portfolio were quoted to rhyme/end in the same numbers multiple times during the trading session, while the other twelve stocks were not subjected to the same quotation. The gamified quotation usually starts within a few seconds after Plaintiff opened the Watchlist, and were made to coincide with the manipulation of his portfolio assets. Pursuant to NYSE and Nasdaq Rules, the MM Defendants, as market makers, are the only exchange members obliged to provide continuous Bid/Ask price quotations on the Relevant Securities between 9.30 a.m. to 4.00 p.m. Knowledge of the existence, contents and the viewership of the Watchlist was only possible through access to Plaintiff's Personal Devices. The MM Defendants conspired, coordinated and demonstrated their access to Plaintiff's Personal Devices through the fixing and gamification of the prices of the Relevant Securities. The MM Defendants continued the scheme in other non-public charts in Yahoo Finance and Google Finance created by Plaintiff throughout the Relevant Period.

51.     For example, on September 20, 2021, while monitoring the Watchlist on his mobile phone, Plaintiff noticed that the Bid and Ask numbers of four out of the sixteen stocks were being systematically quoted to end in identical numbers. At 2.30 p.m., Plaintiff decided to take a screenshot, showing: RIDE, Last $6.90, Bid $6.89, Ask $6.90; AHT, Last $13.90, Bid 13.89, Ask $13.91; AIV, Last $6.81, Bid 6.80, Ask $6.81; MPLN, Last $6.11, Bid $6.10, Ask $6.11. A few seconds later, the MM Defendants rearranged the numbers to: RIDE, Last $6.90, Bid $6.90, Ask $6.91; AHT, Last $13.90, Bid 13.89, Ask $13.91; AIV, Last $6.81, Bid 6.80, Ask $6.81; MPLN, Last $6.11, Bid $6.10, Ask $6.11.

These four stocks constituted almost 100% of Plaintiff's portfolio. The MM Defendants could not have created this pattern of stock quotations without access to the Watchlist on Plaintiff's mobile phone and without the motivation to target and defraud him. See inserted screenshots.



52.     The table below shows some of the number gamifications and parallelism by the MM Defendants through October 7, 2021. The MM Defendants continued these gamifications throughout the Relevant Period anytime Plaintiff opened the Watchlist or other stock monitors.

| DATE | TIME | TICKER | LAST | BID | ASK | SOURCE |
|---|---|---|---|---|---|---|
| 9/21/2021 | 9:42 A | RIDE | 6.86 | 6.86 | 6.87 | S'shot |
| | | AHT | 14.82 | 14.80 | 14.81 | S'shot |
| | | MPLN | 5.81 | 5.80 | 5.81 | S'shot |
| | | AIV | 6.86 | 6.86 | 6.87 | S'shot |
| 9/23/2021 | 9:57 A | RIDE | 7.19 | 7.18 | 7.19 | S'shot |
| | | AHT | 15.17 | 15.18 | 15.19 | S'shot |
| | 11:44A | RIDE | 7.36 | 7.36 | 7.37 | S'shot |
| | | AHT | 15.37 | 15.36 | 15.37 | S'shot |
| | 12:42 P | RIDE | 7.46 | 7.46 | 7.47 | S'shot |
| | | AHT | 15.46 | 15.46 | 15.47 | S'shot |
| | 1:22 P | RIDE | 7.39 | 7.39 | 7.40 | S'shot |
| | | AHT | 15.49 | 15.49 | 15.49 | S'shot |
| | 2:50 P | RIDE | 7.47 | 7.46 | 7.47 | S'shot |
| | | AHT | 15.47 | 15.46 | 15.47 | S'shot |
| | 2:58 P | RIDE | 7.46 | 7.46 | 7.47 | S'shot |
| | | AHT | 15.46 | 15.46 | 15.47 | S'shot |

| | 3:33 P | RIDE | 7.47 | 7.46 | 7.47 | S'shot |
|---|---|---|---|---|---|---|
| | | AHT | 15.36 | 15.36 | 15.37 | S'shot |
| | | MPLN | 6.11 | 6.10 | 6.11 | S'shot |
| | | AIV | 7.00 | 7.00 | 7.01 | S'shot |
| 9/24/2021 | 12:29 P | RIDE | 7.67 | 7.66 | 7.67 | S'shot |
| | | AHT | 15.57 | 15.56 | 15.57 | S'shot |
| | | MPLN | 5.97 | 15.56 | 15.57 | S'shot |
| | 2:20 P | RIDE | 7.63 | 7.62 | 7.63 | S'shot |
| | | AHT | 15.43 | 15.42 | 15.43 | S'shot |
| | | MPLN | 5.87 | 5.86 | 5.87 | S'shot |
| | | AIV | 6.87 | 6.87 | 6.88 | S'shot |
| | 3:08 P | RIDE | 7.58 | 7.58 | 7.59 | S'shot |
| | | AHT | 15.58 | 15.58 | 15.59 | S'shot |
| | | MPLN | 5.86 | 5.85 | 5.86 | S'shot |
| | | AIV | 6.89 | 6.88 | 6.89 | S'shot |
| | | GSAT | 1.69 | 1.68 | 1.69 | S'shot |
| 9/27/2021 | 12:16 P | RIDE | 7.71 | 7.70 | 7.71 | S'shot |
| | | AHT | 16.71 | 7.70 | 7.71 | S'shot |
| | | GSAT | 1.75 | 1.75 | 1.76 | S'shot |
| | | GREE | 25.85 | 25.75 | 26.13 | S'shot |
| | 12:39 P | RIDE | 7.71 | 7.70 | 7.71 | S'shot |
| | | AHT | 15.71 | 16.70 | 7.71 | S'shot |
| | | GREE | 26.11 | 26.00 | 26.13 | S'shot |
| 9/30/2021 | 12:41 P | RIDE | 7.92 | 7.91 | 7.92 | S'shot |
| | | AHT | 14.62 | 1.61 | 1.62 | S'shot |
| | | MPLN | 5.51 | 5.51 | 5.52 | S'shot |
| 10/1/2021 | 2:27 P | RIDE | 6.73 | 6.73 | 6.74 | S'shot |
| | | AHT | 15.74 | 15.73 | 15.74 | S'shot |
| | | MPLN | 5.63 | 5.62 | 5.63 | S'shot |
| | | AIV | 7.33 | 7.32 | 7.33 | S'shot |
| 10/4/2021 | 1:00 P | RIDE | 6.01 | 6.00 | 6.01 | S'shot |
| | | AHT | 14.61 | 14.60 | 14.61 | S'shot |
| | | MPLN | 5.60 | 5.59 | 5.60 | S'shot |
| | | AIV | 7.19 | 7.19 | 7.20 | S'shot |
| 10/5/2021 | 2:40 P | RIDE | 5.28 | 5.27 | 5.28 | S'shot |
| | | AHT | 13.88 | 13.87 | 13.88 | S'shot |
| 10/7/2021 | 12:48 P | RIDE | 5.23 | 5.22 | 5.23 | S'shot |
| | | AHT | 14.33 | 14.32 | 14.33 | S'shot |
| | | MPLN | 5.23 | 5.22 | 5.23 | S'shot |
| | | AIV | 7.18 | 7.17 | 7.18 | S'shot |
| | | GSAT | 1.57 | 1.57 | 1.58 | S'shot |
| | 12:51 P | RIDE | 5.22 | 5.21 | 5.22 | S'shot |
| | | AHT | 14.32 | 14.31 | 14.32 | S'shot |
| | | MPLN | 5.22 | 5.21 | 5.22 | S'shot |

MM DEFENDANTS INTENSIFY PORTFOLIO MANIPULATION

53.    From the second week of October 2021, the MM Defendants intensified the manipulative scheme using the options system as described in Paragraphs 47 and 49. For example, at 10.37 a.m. on October 8, 2021, the MM Defendants and their agents fraudulently placed price quotations for the Relevant Options Symbols/Cusips which abruptly cut the total Webull account value in half to $90,528. Similarly, at 9.30 a.m. on October 18, 2021, the MM Defendants repeated the fraudulent price quotations for the Relevant Options Symbols/Cusips and manipulated the account down to $51,315 creating a loss of $115,669. Furthermore, on October 19, 2021, during the pre-market session, MM Defendants continued the manipulation, with the total Webull account value showing $110,655 with $55,000 of loss. Webull's technology did not recalculate and reset the account values. Options trading was not open to the public until the market opened at 9.30 a.m. Only the MM Defendants, as market makers, and brokers such as Defendant Webull, could quote prices on the Relevant Options Symbols/Cusips in the pre-market session.

54.    The Defendant Webull's technology was unable to properly calculate the portfolio asset values to discount the arbitrary figures the MM Defendants quoted on the Relevant Options Symbols/Cusips in furtherance of the manipulative scheme. Thus, Defendant Webull started sending multiple margin call notifications to Plaintiff. Whenever Plaintiff made the deposit, the MM Defendants would see the transaction through their access to Plaintiff's Personal Devices and manipulate off the credit. Webull would send another margin call notice within the next few trading days, repeating the cycle. For example, on October 6, 2021, Plaintiff deposited $15,000 into the account to boost the maintenance margins. The MM Defendants observed the deposit through their access to Plaintiff's Devices and the Webull account. On October 8, 2023, they manipulated the values as described in Paragraph 53 to discount the credit. Plaintiff called Webull on October 19, 2021 at 9.37 a.m., and October 27, 2021 at 12.26 p.m. and complained that the portfolio values were not being updated.

.55.  On October 21, 2021, Plaintiff filed a complaint with the Federal Trade Commission Internet Crimes Unit ("FTC"), and the FBI (iC3) alleging identity theft and appropriation by market insiders. Again, Plaintiff included the Exchanges among the suspects, as he was unsure about responsibility

56. At 9.30 a.m. on October 22, 2021, the total account value jumped from $107,000 to $126,000. On October 25, 2021, the account jumped from $102,884 to $124,284 at 9.30 a.m. At 9.40 a.m., all stocks in the account were down, however, the account value was positive, clearly supporting the fact that the MM Defendants controlled and manipulated the portfolio balances through their price quotations on the Relevant Options Symbols/Cusips. Prior to filing the FTC/FBI complaints, the MM Defendants sold down the account every trading day as soon as the markets opened. Plaintiff believed that the MM Defendants got cautionary after observing the transmission of the FBI/FTC complaints. The MM Defendants paused the early morning manipulations until the second week of November 2021.

57. On November 10, 2021, the MM Defendants resumed the manipulation using the same scheme stated in Paragraphs 47, 48, and 53. At 9.30 a.m. they manipulated the total account value to $96,872. At 9.30 a.m. on November 12, 2021, they manipulated the account value to $75,998. At 9.30 a.m. on November 15, 2021, they manipulated the account value to $86,035 from $114,753. Plaintiff was forced to deposit $6000 to the account. On November 16, 2021, Plaintiff confirmed the credit. However, MM Defendants tracked the deposit and fraudulently quoted the Relevant Options Symbols/Cusip to discount it. Horrified, Plaintiff deposited $500 more to prevent a margin call. The MM Defendants stalked and tracked each financial transaction and used their price quotation for the Relevant Options Symbols/Cusips to discount the credit, while schematically taking the portfolio values down each trading day. Defendant Webull continued to transfer the manipulated account balance into the next day with no recalculation or resetting, such that the account displayed huge losses each day prior to market opening but with little or no price movements in the portfolio stocks. Plaintiff will introduce evidence showing MM Defendants manipulating stock prices to deceive him in reaction to financial transactions on his Personal Devices.

58. Furthermore, at 9.30 a.m. on November 22, 2021, the MM Defendants manipulated the account value from $84,148 to $28,083. Plaintiff had to deposit $2,000 to prevent a margin call. At the opening bell on November 24, 2021, they manipulated the account down from $77,741 to $23,455. Exasperated, pained, and in immense distress, Plaintiff halted the video recording, jumped into his vehicle and contemplated

harming himself. Plaintiff developed severe emotion distress, had his blood pressure constantly very high, suffered severe headaches, and continued to rely on counseling from friends and healthcare professionals.

WEBULL'S AUTOMATED SYSTEM FAILED TO CALCULATE ACCOUNT VALUES

59. The wild gyrations from the manipulation caused Defendant Webull to arbitrarily miscalculate the account values, and randomly displayed net asset values that were divulged from the account positions. Plaintiff further complained to Webull on November 11, 2021 that his account balances were not being updated. Lucy from Webull's support team replied that there was no problem. On November 12, 2021, the same day Lucy responded to the complaint, Webull assessed another margin call on the account despite its positive buying power, but dropped it the next day

60. The Defendant Webull operated a faulty technology that was unable to properly calculate the account values. Plaintiff had his first experience with the faulty technology from July to August 2021. Despite repeated promises of a fix by Defendant Webull, the technology was unable to properly calculate Plaintiff's portfolio balances causing asset losses following a reverse stock split by Ashford Hospitality Trust in July 2021. On January 7, 2022, an assistant director at Webull, Jay Martinez, suggested in an email that the Defendant Webull's technology was causing "adverse changes" to the net asset values in Plaintiff's portfolio during the day." On January 27, 2022, Jay Martinez suggested that the Defendant Webull's Technology wrongly sold off Plaintiff's assets. On March 9, 2023, FINRA found that the Defendant Webull's systems had program errors during the Relevant Period that caused the Defendant Webull to make various mistakes relating to options accounts.[8]

61. Meanwhile, the MM Defendants intensified the manipulative scheme. At 9.30 a.m. on November 26, 2021, they fraudulently quoted the Relevant Options Symbols/Cusips to manipulate the account value down to $17,654.11. The three stocks in the account were trading higher.  Plaintiff faced imminent financial destruction absent an intervention by regulators and the security services. In that distress,

---

[8] https://www.finra.org/media-center/newsreleases/2023/finra-fines-webull-3-million-options-customer-approval-violations

Plaintiff filed another complaint with the SEC, and copied Congressman Anthony Brown, US Senator Chris Van Hollen, Senator Benjamin Cardin, and the Defendant Webull. Plaintiff was depressed, ran very high blood pressure, and received counseling from a friend that operated a mental health facility.

## WEBULL COMMITTED TO INVESTIGATING THE MANIPULATION

62. Frank D, on behalf of the Defendant Webull, responded on November 26, 2021, and told Plaintiff that it would "begin to conduct an investigation on your behalf." The Defendant Webull asked Plaintiff to send any other videos, photos, or evidence to add it to their investigation. Plaintiff was relieved that Defendant Webull accepted and assumed the responsibility to investigate the account manipulation. However, on the same day, the Defendant Webull sent Plaintiff a margin call for $7,227.93. On Saturday, November 27, 2021, the margin call dropped off and Plaintiff saw positive value of over $12,000 after the Defendant Webull apparently readjusted account values from the arbitrary options quotation prices set by the MM Defendants on the Relevant Options Symbols/Cusips. This would be the first time and the last time Defendant Webull would readjust the account values in line with industry practice to reflect the actual portfolio value.

63. By Monday, November 29, 2021, the margin call for $7,227.93 was returned, making Plaintiff to believe that the Defendant Webull did not have any intention of investigating the manipulations at the time it committed to it, or discussed with the MM Defendants and chose to cooperate in the fraudulent scheme. Upon research, observation, and belief, Webull knew that it was not going to investigate the complaint when it assumed the responsibility to so do. Further, Webull ought to have known that the account values were being eroded by the abnormal, bizarre, schematic and arbitrary pricing of the Relevant Options Symbols/Cusips. The Defendant Webull deceived Plaintiff into believing that it was investigating the complaint on his behalf. In 2023, FINRA found "that from May 2018 through December 2021, the Defendant Webull's supervisory system created to identify and respond to customer complaints was not reasonably designed. Among other things, the firm failed to commit the staff and resources necessary to keep pace with the hundreds of thousands of customer communications it received, which

included complaints. The firm also did not report certain written customer complaints to FINRA, as required, including complaints that involved allegations of theft or misappropriation."[9] The Defendant Webull agreed to pay $3 million in fines to FINRA.

### WEBULL PROVIDED FALSE AND MISLEADING "INITIAL OBSERVATIONS"

64. On December 1, 2021, Plaintiff received an email from the Defendant Webull written by Miles, an Options Account Supervisor. Miles stated: "We are still researching your complaint. I am happy to schedule a call with you today or tomorrow to review your account and some initial observations. At 5.07 p.m., Miles stated that his initial suspicion was that "Options Opening Rotation" could have been responsible for the portfolio value swings. Plaintiff replied that opening rotation could not just repeatedly target the account and affect it in a particular way on a daily basis, or cut the account in half with each opening. Plaintiff also told Miles about video recordings sent to the Defendant Webull showing the portfolio value being manipulated and depressed at various times of the day. Clearly, the Defendant Webull did not watch the videos sent by Plaintiff at its request. Otherwise, Defendant Webull would not have attempted to blame the fraudulent attack on the account values on opening rotations – which occurs at market opening.  Miles then told Plaintiff that the Defendant Webull was still researching the complaint

65. The representation by Miles was false.[10] However, as requested by the Defendant Webull, Plaintiff continued to send the broker screenshots and video recordings depicting targeted and systematic daily manipulations of the portfolio values by the MM Defendants. Between November 29, 2021 through January 4, 2022, Plaintiff emailed sixty-six (66) video recordings and data to the Defendant Webull. After the Miles call, the Defendant Webull did not contact Plaintiff nor respond to the emails it received until January 4, 2022. In that period, the Defendant Webull issued margin calls and sold-off 13,500 AHT

---

[9] https://www.finra.org/media-center/newsreleases/2023/finra-fines-webull-3-million-options-customer-approval-violations
[10] Jay Martinez, an associate director at Webull, contradicted Miles on January 4, 2022, stating that the fluctuations in the account value was because Plaintiff sold illiquid leaps as covered calls.

shares, and 40,000 RIDE shares at a fraction of the cost, bought back the covered call options at a price set artificially by the MM Defendants, and caused over $200,000 of losses to the portfolio.

## WEBULL SOLD AWAY THE PORTFOLIO WHILE INVESTIGATING IT

66. On December 3, 2021, with no warning or further contacts or information, the Defendant Webull sold off 13,500 AHT shares out of the 14,100 total holdings in the account. The liquidated shares were all hedged by covered calls, which meant that, working with the MM Defendants, Defendant Webull bought back these covered calls at inflated prices. While the recovery value of the AHT shares was about $25, the Defendant Webull only realized about $8 per share after buying back the options. On that day, the portfolio value was more than the maintenance margin requirement and Defendant Webull was under a fiduciary duty that it voluntarily assumed

67. On December 10, 2021, Plaintiff sent the Defendant Webull an email with a video recorded at 10:37 a.m. Prior to the email, the MM Defendants manipulated the account value down to $14,000 by placing manipulative price quotations on the Relevant Options Symbols/Cusips. At about 10.25 a.m., Plaintiff posted messages on Yahoo Finance about his new YouTube Channel, ExchangeMarketMakerFraud,[11] and a new website, www.marketmakerfraud.com, which he created to discuss the manipulation. Three minutes later, the MM Defendants panicked and jumped the total account value from $14,000 to $37,700, and $41,000 by the fifth minute. On December 15, 2021, Plaintiff posted the link to a video regarding the manipulative scheme on the YouTube Channel. The MM Defendants reacted by using their price quotations of the Relevant Options Symbols/Cusips to manipulate the total account value to negative - $29,000. Plaintiff was mentally devastated and sought help.

68. On December 17, 2021, the Defendant Webull abruptly increased the margin maintenance on RIDE to 1.67 from 2X, and assessed a new $29,472 margin call on the portfolio. Based on the reversal after three days within which the Defendant Webull sold off RIDE shares, the Defendant Webull increased the RIDE

---

[11] This YouTube channel was mistakenly deleted on June 16, 2024, as Plaintiff audited his profile.

margin rate as a cover to induce the selling of the RIDE assets through the margin in further cooperation with the MM Defendants. On that date, the Defendant Webull was still holding itself out to be investigating the portfolio manipulation on behalf of Plaintiff – a self-assumed obligation that required it to act in the best interest of the plaintiff. The Defendant Webull had an incentive for self-dealing. The average account value at the Defendant Webull at this time was $25,000. Plaintiff's account value was over $200,000 with over 90 percent of the values tied up by the MM Defendants through the schematic and manipulative pricing of the Relevant Options Symbols/Cusips. By inducing and selling off as much of the assets as it could, the Defendant Webull was cashing in on the assets together with the MM Defendants. Moreover, Defendant Webull received substantial revenue from the MM Defendants in the form of Payment for Order Flow.

69. On December 22, 2021, Plaintiff sent a message to the Defendant Webull to stop selling off the portfolio while it was investigating the complaint. The Defendant Webull replied that it received the videos sent by Plaintiff and that "your case has been escalated to investigate." Shortly thereafter, the Defendant Webull sold 15,000 RIDE shares, and another 9,000 the next day. After inducing and selling 24,000 RIDE shares, The Defendant Webull changed RIDE margin rate back down to 2X from 1.67, exactly where it was three trading days earlier Moreover, the Defendant Webull sold off the RIDE positions without resetting its technology to properly calculate the portfolio values from the values created by the MM Defendants' fraudulent pricing of the quotations for the Relevant Options.

70.  On December 23, 2021, Plaintiff decided to reactivate a TD Ameritrade account to reduce the reliance on the Defendant Webull. The MM Defendants tracked the transaction and manipulated the options in the TD Ameritrade portfolio to impose a negative balance of $5,658.82, making it unusable for Plaintiff. The portfolio had $406 in cash and did not have any margin loans. The MM Defendants continued to manipulate the TD Ameritrade portfolio values to make it inoperable.

71. On December 28, 2021, the MM Defendants placed price quotations on the Relevant Options Symbols/Cusips to manipulate the total account value to negative -$33,406 at 9.30 a.m. Meanwhile the

prices of the Relevant Securities were stable. At 9.50 a.m., the MM Defendants started gamifying RIDE and AHT as Plaintiff monitored the stocks in his Watchlist in agony. They quoted RIDE prices as Last $3.99, Bid $3.99, Ask $4.00; for AHT, they quoted Last $10.59, Bid $10.58, and Ask $10.60. The gamification continued through 10.20 a.m. After Plaintiff reopened the Watchlist at 1.44 p.m., they resumed, quoting RIDE Bid $3.87, Ask $3.88; for AHT, Bid $10.37 and Ask $10.38. They continued the manipulation into 2.08 p.m. The next day on December 29, 2021, the MM Defendants placed manipulative price quotations on the Relevant Options Symbols/Cusips and sold down the total account value to -$1,655 at 9.30 a.m.

72. As the manipulation intensified Plaintiff would visit Nasdaqtrader.com and see the names of the large, sophisticated companies listed as market participants in the Relevant securities. Plaintiff recorded all the MM Defendants with their trading tickers on Level II platforms actively placing Bid/Ask price quotations on the Relevant Securities during the Relevant Period. All the MM Defendants conspired to monitored Plaintiff's Personal Devices and coordinated in placing the lockstep trades and gamifying Bid/Ask quotations on the Relevant Securities as part of their strategy and messaging system to defraud Plaintiff. Plaintiff hereby incorporates the video recordings. Plaintiff could not imagine that all the companies would conspire and coordinate to defraud him. He continued to contact regulators and law enforcement in order to investigate the manipulation. His reliance in the efficiency of the US stock markets beclouded him. He invested more money believing that the manipulation would stop. He continued to collect data in order to comprehend the manipulative scheme.

73. On December 30, 2021, Plaintiff sent an email to the Defendant Webull reminding the broker of its commitment and inquiring about the status of the investigation. The Defendant Webull immediately changed the margin requirement for RIDE back to 1.67 from 2X, just as it did on December 17, 2021, in order to induce another to sell the assets. Under cover the change, the Defendant Webull issued a new margin call on the account. The MM Defendants again monitored Defendant Webull's changes. At about 11.10 a.m., as all the Relevant Securities were trading up, the MM Defendants placed manipulative prices

on the Relevant Options Symbols/Cusips and drove the total account value to a negative -$3,000. In a video recorded at 11.11 a.m. that day and later posted on YouTube12, Plaintiff did not understand how the MM Defendants got the exact details of his portfolio or how they were able to manipulate the values. Unknown to the Plaintiff, the MM Defendants obtained his account login details, accessed the accounts and obtained details of every security holding. They close the account value at $6,000 even though RIDE, at 95% of the portfolio, closed at $3.54.13

74. Throughout December 2021, as the Defendant Webull sold away the portfolio assets relying on erroneous margin calls that resulted from the schematic manipulation, the MM Defendants continued to gamify and parallel the prices of the Relevant Securities exactly as they appeared on the Watchlist in Plaintiff's mobile phone. The table below displays selected pricing pursuant to the scheme:

| Date | Time | Ticker | Last | Bid | Ask | Source |
|------|------|--------|------|-----|-----|--------|
| 12/07/2021 | 11:30 A | RIDE | 4.36 | 4.35 | 4.36 | Phone |
| | | AHT | 10.76 | 10.75 | 10.76 | Phone |
| 12/08/2021 | 12:10 P | RIDE | 4.48 | 4.48 | 4.49 | Phone |
| | | MPLN | 4.49 | 4.48 | 4.49 | Phone |
| | 3:25 P | RIDE | 4.48 | 4.47 | 4.48 | Phone |
| | | RIDE | 4.48 | 4.47 | 4.48 | Phone |
| 12/09/2021 | 1:19 P | RIDE | 4.33 | 4.32 | 4.33 | Phone |
| | | AHT | 10.52 | 10.52 | 10.53 | Phone |
| | 3:14 P | RIDE | 4.19 | 4.19 | 4.20 | Phone |
| | | AHT | 10.50 | 10.49 | 10.50 | Phone |
| | 3:17 P | RIDE | 4.22 | 4.21 | 4.22 | Phone |
| | | AHT | 10.52 | 10.51 | 10.52 | Phone |
| | | MPLN | 4.12 | 4.11 | 4.12 | Phone |
| 12/13/2021 | 10:26 A | RIDE | 4.21 | 4.20 | 4.21 | Video |
| | | AHT | 9.61 | 9.60 | 9.61 | Video |
| | | MPLN | 4.11 | 4.10 | 4.11 | Video |
| 12/14/2021 | 11:33 A | RIDE | 4.09 | 4.08 | 4.09 | Phone |
| | | AHT | 10.08 | 10.08 | 10.09 | Phone |
| | | MPLN | 4.38 | 4.38 | 4.09 | Phone |
| 12/16/2021 | 11:35 A | RIDE | 4.12 | 4.11 | 4.12 | Phone |

---

[12] https://www.youtube.com/watch?v=6MkvfTqx5Us. After this YouTube account was deleted on 6/16/2024, Plaintiff reposted the video here: https://www.youtube.com/watch?v=fa0u6yhFjjE&t=379s
[13] In contrast. on January 6, 2022, RIDE closed at $3.22, yet the account value closed at about $18,000. Webull's technology was clearly miscalculating the account values due to the manipulative scheme.  Notwithstanding the disconnect between the account values and the prices of the stock that make up the portfolio, Webull claimed in an email to Plaintiff on January 7, 2022, that it calculated account values based on the closing prices of the stock or depreciation in the share prices.

| | | AHT | 10.11 | 10.11 | 10.12 | Phone |
|---|---|---|---|---|---|---|
| | 12:32 P | RIDE | 4.04 | 4.03 | 4.04 | Phone |
| | | AHT | 10.04 | 10.03 | 10.04 | Phone |
| | 2:26 P | RIDE | 3.96 | 3.96 | 3.97 | Phone |
| | | AHT | 9.77 | 9.75 | 9.77 | Phone |
| 12/17/2021 | 3:02 P | RIDE | 4.13 | 4.12 | 4.13 | Video |
| | | AHT | 10.22 | 10.22 | 10.23 | Video |
| | | MPLN | 4.32 | 4.32 | 4.33 | Video |
| | 3:25 P | RIDE | 4.08 | 4.07 | 4.08 | Video |
| | | AHT | 10.18 | 10.17 | 10.18 | Video |
| | 3.58 P | RIDE | 4.06 | 4.05 | 4.06 | Video |
| | | AHT | 10.15 | 10.15 | 10.16 | Video |
| | | MPLN | 4.16 | 4.15 | 4.17 | Video |
| 12/20/2021 | 11:09 | RIDE | 3.73 | 3.72 | 3.73 | Video |
| | | AHT | 9.74 | 9.72 | 9.73 | Video |
| | 3:46 P | RIDE | 3.69 | 3.69 | 3.70 | Video |
| | | AHT | 10.00 | 9.99 | 10.00 | Video |
| 12/22/2021 | 3.30 P | RIDE | 3.96 | 3.95 | 3.96 | Video |
| | | AHT | 11.96 | 11.95 | 11.96 | Video |
| | 3.51 P | RIDE | 3.98 | 3.97 | 3.98 | Video |
| | | AHT | 11.18 | 11.17 | 11.18 | Video |
| | | MPLN | 4.28 | 4.27 | 4.28 | Video |
| 1/3/2022 | 10:16 A | RIDE | 3.52 | 3.51 | 3.52 | Video |
| | | AHT | 10.51 | 10.51 | 10.52 | Video |
| | 11:43 A | RIDE | 3.68 | 3.67 | 3.68 | Video |
| | | AHT | 10.27 | 10.27 | 10.28 | Video |

### WEBULL RESPONDED TO THE COMPLAINT AFTER  37 DAYS

75. At 1.55 p.m. on January 4, 2022, the Defendant Webull sent Plaintiff an email stating that it did not

find evidence of manipulation. Defendant Webull did not provide any data to support its conclusion

despite Plaintiff's request. In an email sent at 4.52 p.m., Jay Martinez dismissed the 66 videos sent by

Plaintiff, listed the various deposits Plaintiff made into the account in 2021, stated that Defendant Webull

"already contacted you about the investigation and how the opening rotation for options can affect you

Net Account Value." His ramblings suggested that Defendant Webull did not conduct any investigation

but relied on Mr. Miles' false representations on December 1, 2021. However, it continued to lead

Plaintiff on in the belief that it was investigating.  Defendant Webull was made aware that the account

was compromised on November 26, 2021, when it undertook the duty to investigate. FINRA has a

checklist of procedures to be followed under the circumstance as seen in Footnote 6. There was no

25

indication that the Defendant Webull followed the checklist or that any investigation was conducted. In fact, on January 27, 2022, Jay Martinez, while apologizing for the unauthorized liquidation of Plaintiff's assets as stated in Paragraph 80, told Plaintiff that Defendant Webull was unable to determine who sold off the assets as no employee so admitted. Even with this clear evidence of compromised protection for the account, the Defendant Webull did not monitor or investigate it. Meanwhile, Defendant Webull received 66 video recordings and screenshots showing targeted, systematic, and schematic manipulation of the portfolio values at all times. Plaintiff believes that the Defendant Webull ignored all the red flags because it was cooperating and participating in the fraud with its business partners, the MM Defendants.

76. On January 5, 2022, the Defendant Webull's program errors established $8,146.30 in margin call when the total account value was $73,691.58 and the maintenance margin requirement was $65,653.54. On January 6, 2022, Plaintiff sent the Defendant Webull a snip showing a margin call for $11,349 when the average market value was more than the maintenance margin of $61,003.71. Regardless, the Defendant Webull sold off RIDE shares.

WEBULL ADMITTED THAT ITS TECHNOLOGY CAUSED "ADVERSE CHANGES"

77. At 9.30 a.m. on January 7, 2022, the MM Defendants placed manipulative price quotations on the Relevant Options Symbols/Cusips and drove the total account values down to $3,000 from $18,000 as the Relevant Securities were trading higher. At 10.07 a.m., Plaintiff sent the Defendant Webull, an email showing the account values being taken down while the stocks traded higher. Jay Martinez responded that he would "contact our Technology department about the adverse changes to your NAV during the day." Jay's response indicated that the Defendant Webull did not investigate the complaint after assuring Plaintiff that it would do so on his behalf.  As stated in Paragraph 63, during this period, FINRA found that the Defendant Webull "failed to commit the staff and resources necessary to keep pace with the hundreds of thousands of customer communications it received, which included complaints." In reliance on the Defendant Webull's representation, Plaintiff continued to diligently monitor, record, harvest data

and send to the Defendant Webull for 37 days, while the Defendant Webull sold away portfolio securities and engaged in self-dealing with the knowledge that Plaintiff was waiting for the investigation.

### WEBULL ISSUED BOGUS MARGIN CALLS, ENGAGED IN SECRETIVE, DISCRETIONARY, AND UNAUTHORIZED TRADING OF PORTFOLIO SECURITIES

78.  On January 20, 2022, the Defendant Webull sent Plaintiff an email demanding $24,718.56 in margin calls while the margin debt was less than the requested amount. On, January 21, 2022, the Defendant Webull sent another erroneous demand for $24,826.70, while the portfolio had 19,600 covered RIDE shares. At 2.54 p.m., the Defendant Webull executed the bogus demand and sold 10,000 covered RIDE shares for a net value of $1.78. At 3.48.15 p.m., the Defendant Webull commenced unauthorized discretionary trading of the portfolio and shorted 160 Jan 19 2024 RIDE $4.00 Calls, creating -$4,284.85 in negative value and added $26,364.26 in new margin debt. In order to deceive and defraud Plaintiff, the Defendant Webull breached its fiduciary duty and did not disclose the unauthorized discretionary trades.

79. Following the unauthorized discretionary trades, 9,600 RIDE and 600 AHT shares remained in the portfolio with a debt balance of $8,718. On January 24, 2022, the Defendant Webull sent Plaintiff a new margin notice for $24,000 while the margin debt was $8,718. On January 25, 2022, the Defendant Webull doubled down and demanded $42,155.64. The Defendant Webull warned that it would liquidate the portfolio assets to satisfy the bogus demand. On January 26, 2022, the Defendant Webull sent another notice for $35,934.62. The Defendant Webull continued to rely on the faulty technology that it used to sell away Plaintiff's portfolio assets from December 3, 2021, under the guise of margin calls.

### WEBULL LIQUIDATED THE PORTFOLIO AND CONVERTED THE ASSETS

80. On January 27, Plaintiff checked the account balance at 8.47 a.m. It had 9,600 RIDE shares, 600 AHT shares, and a debt balance of $8,718 only. At exactly 12 noon, the Defendant Webull's associate director, Jay Martinez, called Plaintiff and said that he wanted to apologize for what happened earlier in the morning. Jay stated that the Defendant Webull sold off the entire 9,600 RIDE covered shares when the market opened. According to Jay, the Defendant Webull was unable to find the representative that

liquidated the position as "no individual in Webull accepted making the sale." Jay stated that the Defendant Webull's technology likely made the sale and that the Defendant Webull technology teams were still trying to figure out what exactly happened to the account. Jay stated that the Defendant Webull was going to reverse or buy back the shares and options. Further, the Defendant Webull would return all interest paid in the account for the preceding two months. Jay was to call Plaintiff back in the evening to report the reversal. Plaintiff logged into the account and saw over $8,000 of positive cash. However, the Defendant Webull's platform still displayed a margin call for $6,800. This was the second time in one week that the Defendant Webull engaged in discretionary trading of the account.

81. Jay called Plaintiff again at 6.50 p.m. to report the reversal, asked him to verify the next day, and told him to take his time in meeting the remaining margin call. On January 28, 2022, Plaintiff noticed that the 9,600 covered stock was returned, but the Defendant Webull raised the debt to $10,400 versus the $8,718 prior to the sell-off.  The Defendant Webull also increased the margin call to $9,262 from $6,838.62 stated in a margin notice issued on January 27, 2022. The Defendant inflated the margin debt in order to continue to catch in on its technology failure, the MM Defendant's fraud, and fiduciary duty breach.

82. The Defendant Webull's unauthorized, undisclosed, and discretionary trading of January 21 and 27, 2022, the bogus margin call notices, the inflation of the margin debt following the liquidation and the failure to restore the portfolio to its position prior to the unauthorized sales, convinced Plaintiff not only about Webull's technology and program errors, but Webull's complicity in the manipulative scheme. From December 3, 2021, through January 27, 2022, the Defendant Webull sold off 58,000 RIDE covered stocks, and 13,500 AHT covered stocks in reliance on the bogus, inaccurate, erroneous, and manipulated portfolio values. Within the same period, the assets dropped from $270,000 to $15,000. On January 31, 2022, Plaintiff demanded a forensic audit and asked the Defendant Webull to return the account to the position it would have been had its technology not interfered with the values from December 3, 2021.

WEBULL RETALIATED AGAINST PLAINTIFF

83. The Defendant Webull retaliated on February 2, 2022, and sold the shares that it just bought back on January 27, 2022. In doing so, the Defendant Webull also broke the commitment Jay made to Plaintiff on the evening phone call on January 27, 2022, to take his time in meeting the remaining margin debt. The Defendant Webull sold off 3,100 RIDE covered stocks and another 1,000 on February 3, 2022 for $8,400. The Defendant Webull manipulated the margin balance to $1,810.78, reflecting an increase of $1,492. Meanwhile, its technology continued to erroneously assess and display "RM CALL" for $2,597.49.

84. On February 8, 2022, Jay responded to the request for a forensic audit and asked for "24-48 hours" to respond properly. Seven weeks later, the Defendant Webull did not respond. On March 29, 2022, Plaintiff wrote the Defendant Webull demanding all documents relating to the account, including agreements. On March 29, 2022, the Defendant Webull responded that there were no arbitration agreements related to the resolution of the account issues.  The Defendant Webull continued to issue the margin calls while retaining portfolio assets. On May 24, 2023, following Lordstown Motors' reverse stock split, the Defendant Webull demanded $13,744.50 in margin maintenance call. On June 15, 2023, it demanded $148.48. There were no margin debts on the account.

MM DEFENDANTS CONTINUED THE SCHEME THROUGHOUT 2022

85. Following the destruction of the Defendant Webull portfolio assets, Plaintiff struggled to survive, suffered severe emotional distress, withdrew from friends or social contacts, and contemplated suicide multiple times. After a period, Plaintiff sought help after thinking about the uncertain future of his little kids in the event of his demise. Plaintiff discussed the matter with a few friends, borrowed money to pay bills, and got multiple counseling from a friend that runs a mental health facility.

86. By April 2022, Plaintiff reactivated his TD Ameritrade and Charles Schwab accounts. The MM Defendants monitored the transition through their access to Plaintiff's Personal Devices and resumed the scheme.  Plaintiff recorded multiple videos showing the same pattern of gamification and paralleling of the prices of the Relevant Securities as described in Paragraphs 52 and 74 occurring any time Plaintiff

used the Watchlist through September 13, 2022.  Fearing that the MM Defendants used the Watchlist to monitor him, Plaintiff stopped using the application.

87. Throughout 2022, as Plaintiff bought the Relevant Securities, the MM Defendants monitored the transactions and altered the scheme to focus on manipulating the Relevant Securities in the broader market as Plaintiff did not use any more margin debts. Because RIDE was the largest position, they focused on it. Analysts working for MM Defendants became bearish and issued sell recommendations. Plaintiff believed that the MM Defendants sponsored bad press on the stocks irrespective of any positive developments and sold them down to defraud him.

PLAINTIFF DISCOVERS MM DEFENDANTS' ACCESS AND SCHEME

88. In December 2022, Plaintiff started using Yahoo Finance browsers to track his portfolio. On December 13, 2022, Plaintiff opened two browsers to monitor RIDE and MPLN, respectively. At 10.13 a.m., Plaintiff noticed that RIDE was trading at $1.42 just as MPLN was also trading at $1.62. Alarmed at the gamification on his desktop, Plaintiff started recording the browsers. At 10.14 a.m., the MM Defendants moved RIDE to $1.4250 and MPLN to $1.6250. Plaintiff decided to place the browsers side-by-side to focus the recording. MPLN dropped to $1.61. Suddenly, the MM Defendants slowly started bringing down RIDE from $1.42. At 10.18 a.m., they brought RIDE to $1.41 to align with MPLN at $1.61. At 1.57 p.m., they had dropped RIDE to $1.33. Plaintiff checked AHT. The price was $5.83. That was the day that Plaintiff realized that the MM Defendants had direct access and was monitoring his Personal Devices.

89. The MM Defendants continued the scheme into 2023. For example, at 3.19 p.m. on January 24, 2023, Plaintiff recorded a video showing MM Defendants paralleling RIDE and MPLN prices at $1.23. From 3.24 p.m. to 3.30 p.m., they paired and locked both stocks at $1.2250. Multiple videos recorded from 12.19 p.m. to 1.45 p.m. on February 2, 2023, showed RIDE and MPLN being traded in lockstep from $1.4350 to $1.48. Further, videos recorded on February 27, 2023, and March 3, 2023 showed RIDE and MPLN prices locked at $1.0850 at 10.30 a.m. and $1.1250 at 3.48 p.m., respectively. The total volume of

shares traded on March 3, 2023, were identical at three million. On April 12, 2023, Goldman Sachs repeated its recommendation to sell RIDE.

90. On January 24,2023, Plaintiff bought GNS shares for the first time at about $5. The MM Defendants immediately sold GNS down to $3.40. Plaintiff bought more and it turned upwards. On March 3, 2023, the MM Defendants sold GNS down to $2.05. After Plaintiff bought it at 9.44 a.m., GNS ran upwards, with $2.05 being the lowest price for the day. Plaintiff posted a Tweet about the transaction which received a "Like" by the CEO of Genuis Group, Roger Hamilton. GNS ran above $8 but was sold down to $1 in a few weeks. Defendant Citadel Securities, through its subsidiary, Citadel Advisors, LLC, reported buying 19,800 GNS Call Options. Plaintiff believes that Defendant Citadel Securities acquired the large options position in order to hedge against any upside on the stock as it drives the price down in furtherance of the fraudulent scheme against him. The MM Defendants drove GNS down to $0.51 on January 11, 2024 and removed all price quotations as Plaintiff monitored it, repeating the event stated in Paragraph 46 above. The GNS fraud got so notorious that an investor posting as LaOrca on Stocktwits on 4/24/2024, stated, "GNS is by far the most targeted suppressed stock out there. I don't know why.".

91. Plaintiff sold call options against all positions. On February 24, 2023, the MM Defendants started manipulating the call options in order to discount the account value, make the portfolio inoperable, and inflict severe pain and distress. As RIDE was trading down at $1.02, the MM Defendants manipulated the price of an option to buy the stock at $3 upwards to $0.95, imposing $11,796.40 on the Schwab portfolio.

92. The MM Defendants adopted the pattern of manipulation for the Schwab portfolio through October 2023. For example, on May 5, 2023, as RIDE was trading under $0.60, the MM Defendants quoted the $3 Call at $1.10, imposing $27,823.57 in losses for the day. After Lordstown Motors filed for bankruptcy protection but the stock started going up, the MM Defendants used the method described in paragraphs 47 and 48 above to manipulate the options prices on July 10, 2023, imposing -$1,308,780 or a loss of 2535% on the account. On September 11, 2023, they repeated the manipulation to $1,362,907 while there was $5,779 of positive cash in the account. The last prices traded on the options on those days were less than

two cents. The MM Defendants placed $100 manipulative asking quotations on both dates forcing the CBOE to use $50 as the mid-price and making the account inoperable. Plaintiff complained to broker, Charles Schwab, Inc. In a call with a representative later, he described the pricing as "ridiculous." The representative stated that they would recalculate the account the next day to reflect actual price value. A manager offered and helped Plaintiff to withdraw excess funds from the account despite the million-dollar negative values imposed by the MM defendants.

93. The MM Defendants continued the manipulation, prompting Plaintiff to file a complaint with the CBOE on September 21, 2023. Plaintiff believed that the MM Defendants read the CBOE complaint through his computer. On September 22, they reacted and manipulated the account into -$1,354,504 After Plaintiff started using Ally Financial, the manipulation in the millions of dollars stopped.

94. In May 2023, Plaintiff created Google Finance charts ("Chart") on his desktop to monitor the Relevant Securities. Because only RIDE, AHT, MPLN remained in the portfolio, Plaintiff added AT&T and, later, Tesla, Inc. The MM Defendants accessed the Chart, gamified, and manipulated the price quotations on all five stocks. For example, at 10.19 a.m. on May 5, 2023, they gamified: GNS $0.83, RIDE $3.53, MPLN $1.33. Again, at 11.08 a.m. on July 14, 2023, they manipulated the numbers: T $28.93, GNS $0.69, RIDE $2.39, MPLN $1.99 and TSLA $278.23.

95. In June 2023, Plaintiff acquired 140 AHT Call Option to buy 94 AHT on December 15, 2023, and 46 AHT on January 15, 2024, at $2.50. strike price.  At the time, AHT was trading at $3.80.   Plaintiff paid between $0.80 to $1.80 in premium. The MM Defendants tracked the transactions and sold AHT, GNS, and RIDE in tandem. The MM Defendants conspired to suppress AHT under $2.50 through the options expiration dates in order to defraud Plaintiff. Closer to the 12/15/2023 expiration, Plaintiff started buying AHT shares at $2.05. The MM Defendants coordinated to sell it down to $1.25. After the company announced paying off a strategic debt, the MM Defendants stopped the stock from appreciating beyond $2.07 and sold it down to $1.16 on April 26, 2024 while stalking Plaintiff's portfolio transactions. They continued selling AHT until $0.77 or $32 million market capital despite its $1.4 billion in assets.

96. During the Relevant Period, the MM Defendants remotely controlled Plaintiff's computers and interfered with their operation. Plaintiff reset his Personal Devices multiple times and bought new ones, subscribed to multiple antivirus providers, operated multiple home network providers to avoid the MM Defendants, hired two computer technicians, and spent over $5,600 to address the fraud.

97. After the filing of this Complaint. Plaintiff recorded multiple videos and snips showing that they intensified the fraud.  They accessed and gamified AHT, GNS, RIDEQ, TSLA, T, and DAL from a new Google Finance monitor created on November 14, 2024. For example, on 11.37 a.m. on December 14, 2023, they gamified the price quotes on all the six stocks to end in 9. The MM Defendants continue to access a Yahoo Finance application on Plaintiff's Samsung tablet and remotely control the device. They hacked into and continued the fraud after Plaintiff bought an iPhone in June 2024.  Plaintiff recorded video of the MM Defendants buying up the Relevant Securities at the same time as Plaintiff logged into his bank accounts to deposit funds into his brokerage accounts and taking the stocks down immediately after any transaction. Plaintiff posted some of the manipulative instances, including time-graphics media and charts, on www.marketmakerfraud.com, YouTube Channel-THECRIMINALSOFWALLSTREET, and X.com account, @Chieforji. Plaintiff hereby incorporates the contents of these media.

CLAIMS FOR RELIEF AGAINST THE MM DEFENDANTS

**Count One: Violation of Section 10(b) of the Exchange Act and Rule 10-b-5(a) & (c)**
98. Plaintiff incorporates by reference Paragraphs 1 to 97 as if fully set forth herein.

99. During the Relevant Period, MM Defendants engaged in and employed devices, schemes, illegal acts, practices, and a course of business conduct that were intended to manipulate the market prices of securities held in Plaintiff's portfolio, which operated as a fraud and deceit upon him. Based on Paragraphs 1 to 97, the MM Defendants acted with scienter.

100. As a direct and proximate result of MM Defendants' wrongful conduct, Plaintiff suffered damages in that he and/or his brokers were forced to sell securities at manipulated prices, he was unable to sell securities due to manipulated portfolio values, and was deceived into relying on the manipulated prices

created by the MM Defendants while assuming an efficient market free of manipulation. Plaintiff and/or his brokers would not have sold the shares at the prices derived had the MM Defendants not illegally obtained specific details of his portfolio securities and engaged in manipulative conducts which artificially affected their prices.

**Count Two: Violation of Section a(2) and a(4) of the Computer Fraud and Abuse Act**

101. Plaintiff incorporates by reference Paragraphs 1 to 100 as if fully set forth herein.

102. During the Relevant Period, the MM Defendants intentionally, knowingly, and with intent to defraud, accessed without authorization, computers, mobile phones, tablets, and Internet networks belonging to Plaintiff which he used for private, commercial, and work-related activities within and outside the United States, obtained details of his bank and brokerage account records, and used the records to target and manipulate securities held in his brokerage accounts, thereby obtaining hundreds of thousands of dollars in value. The MM Defendants accomplished the fraud using a method that has been acknowledged by FINRA, which is, to hack into the account using phishing emails, steal passwords, obtain details of the portfolio, and coordinate to compromise market integrity and manipulate the securities. The MM Defendants could not have quoted the pattern of stock prices recorded by Plaintiff during the Relevant Period without access to Plaintiff's Personal Devices. Plaintiff suffered over $5600 of loss trying to resolve the MM Defendants' unauthorized access., including hiring computer technicians and replacing equipment.

**Count Three: Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act**

103. Plaintiff incorporates by reference Paragraphs 1 to 102 as if fully set forth herein.

104. The MM Defendants conspired and entered into an anticompetitive scheme to hack into Plaintiff's computers, mobile devices and network, obtain his bank records and records of brokerage firms, and fix, raise, stabilize, maintain or suppress the prices of the Relevant Securities, and in order to restrain trade.

105. Rather than engage in competition or the ordinary activities of market making, the MM Defendants conspired and agreed with one another to engage in activities that are criminal under federal and Maryland State laws, that is, to stalk Plaintiff, hack his devices and harvest  brokerage accounts login details,  obtain the exact details of his securities portfolio, manipulate the values, short, gamify and artificially lower the prices of the Relevant Stocks, in order to deceive and defraud him, and punish him for his online views. These potential criminal acts are beyond the regulation of the MM Defendants by the SEC and Securities Laws.

106. As a direct and intended result of the MM Defendants' conspiracy, they caused injury to Plaintiff by destroying his Personal Devices, remotely freezing his computers and stopping his professional work and use of the devices, caused him financial losses in attempt to resolve the fraud, and defrauded him over one million dollars ($1,000,000) in brokerage portfolio damages.

**Count Four: Intentional Infliction of Emotional Distress Under Maryland State Law**

107.  Plaintiff incorporates by reference Paragraphs 1 to 106 as if fully set forth herein.

108. During the Relevant Period, the MM Defendants intentionally and willfully conspired to inflict severe emotional distress and pain on Plaintiff by engaging in unlawful acts that were extreme and outrageous, including potentially criminal conducts, in order to defraud him, deceive, stalk and monitor him to ensure that he succumbed to hardship and emotional distress

109. The MM Defendants hacked Plaintiff's Personal Devices which conduct is criminalized under federal and Maryland state laws, stalked and monitored all his activities, remotely interfered with his use of the devices, obtained his financial records, deceived him into investing all his life savings into the Relevant Securities while systematically obtaining the assets using the cover of market making, and defrauded him. Plaintiff was severely depressed for over one year, afflicted by persistent high blood pressure, could not take care of his obligations, as the MM Defendants monitored the effects of their unlawful conduct and placed a death-themed skull with cross-bones in his email profile.

110 Plaintiff suffered severe emotional distress and depression, withdrew from friends, family and social contacts, failed to meet financial obligations, contemplated suicide several times, suffered mental health breakdown, persistent high blood pressure, and had counseling, as the MM Defendants monitored his distress through the cyber-hacking and control of his devices. Plaintiff's emotional distress was directly caused by the conspiracy and manipulative scheme of the MM Defendants and Defendant Webull.

**Count Five: Intentional Violation of Right of Privacy**

111. Plaintiff incorporates by reference Paragraphs 1 to 110 as if fully set forth herein.

112. The MM Defendants willfully and unlawfully intruded into the seclusion of Plaintiff's private life, among other things, by accessing his Personal Devices without authorization, demonstrating their access in multiple ways including by gamifying stocks in his private watchlists and monitors, stalking his and family members' use of the devices, monitoring and stalking financial transactions and manipulating his portfolio securities based on  knowledge of his financial data, remotely interfering with the use of the Personal Devices in order to frustrate hm, and engaging in multiple intentional actions that inflicted mental anguish and emotional distress on Plaintiff.

113. Plaintiff had reasonable expectation of privacy in the use of his Personal Devices and did not share or allow the public to have access to his Personal Devices. The MM Defendants unauthorized intrusion and activities were intentional, highly offensive to a reasonable person and designed to elicit information that was not publicly available. Courts have recognized that such conducts are highly offensive to a reasonable person.

CLAIMS FOR RELIEF AGAINST WEBULL FINANCIAL, LLC

**Count One: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) & (c)**

114. Plaintiff incorporates by reference Paragraphs 1 to 113 as if fully set forth herein.

115. The Defendant Webull willfully and intentionally made multiple untrue statements of material facts and omitted to state facts necessary to make its statements not misleading to Plaintiff.  The Defendant Webull repeatedly provided false and inaccurate portfolio values, deceived Plaintiff by committing to

investigate his complaint when it knew that it would not provide the resources for the investigation. Further, the Defendant Webull provided false and misleading initial information about the portfolio values, provided false margin notices and sold off assets based on the false data. The Defendant Webull continued to provide false and misleading information to Plaintiff regarding restoration of the assets.

116. The Defendant Webull engaged in and employed devices, schemes, illegal acts, practices, and a course of business that were intended to operate as a fraud and deceit upon Plaintiff. After deceiving Plaintiff about the investigation, the Defendant Webull provided a false observation and devised and engaged in a course of business to sell off the portfolio and convert the assets through a combination of illegal and fraudulent acts. Based on paragraphs 1 to 115, the Defendant Webull acted with scienter.

**Count Two: Webull Breached its Fiduciary Duty under Maryland Law**

117. Plaintiff incorporates by reference Paragraphs 1 to 116 as if fully set forth herein.

118. The Defendant Webull owed Plaintiff a fiduciary duty that it assumed in two instances: (1) when it accepted to investigate the manipulation of the account on behalf of Plaintiff, and (2) when it turned the account into a discretionary account by exercising discretion and trading it without authorization on January 21 and 27, 2022. By operation of law, the account became a discretionary portfolio with full fiduciary responsibility going back to the inception.

119.  The Defendant Webull breached its fiduciary duty, among other things, to act in the best interest of the plaintiff and refrain from self-dealing, monitor and ensure the security of the account, provide accurate information, and act honestly and straightforwardly with Plaintiff.

**Count Three: Webull Breached its Brokerage Contract under Maryland Law**

120. Plaintiff incorporates by reference Paragraphs 1 to 119 as if fully set forth herein.

121. The Defendant Webull failed to perform according to contract and commitment, acted and embarked on a course of business showing that it had no intention to perform, and prevented Plaintiff from fulfilling his contractual obligations.

**Count Four: Fraud under Maryland Law**

122. Plaintiff incorporates by reference Paragraphs 1 to 120 as if fully set forth herein.

123. The Defendant Webull made multiple false statements and representations to Plaintiff which it knew and/or ought to have known to be false.  The false statements were made in order to deceive and defraud Plaintiff. Plaintiff reasonably relied on the Defendant Webull's representations in the belief that the Defendant Webull was a professional broker-dealer. But for the Defendant Webull's false statements, Plaintiff would have taken measures to protect the account from losses.

**Count Five: Intentional Misrepresentation under Maryland Law**

124. Plaintiff incorporates by reference Paragraphs 1 to 123 as if fully set forth herein.

**Count Six: Intentional Infliction of Emotional Distress under Maryland Law**

125. Plaintiff incorporates by reference Paragraphs 1 to 124 as if fully set forth herein.

126. Defendant Webull intentionally and willfully caused severe emotional distress to Plaintiff through engaging in unlawful acts that, among other things, unprofessional, unethical and fraudulent contrivances that caused him to have a mental breakdown and receive counseling.

**Count Seven: Professional Negligence**

127. Plaintiff incorporates by reference Paragraphs 1 to 126 as if fully set forth herein.

128. The Defendant Webull owes Plaintiff a duty of professional care as a broker-dealer. The Defendant Webull breached that duty by engaging in unprofessional conduct, among other things, by providing and relying on inaccurate account information, inducing and selling away the assets without authorization, breaching commitments, misappropriating assets and refusing to return them when Plaintiff so demanded.

129. Plaintiff was injured and suffered losses as a direct result of the Defendant Webull's negligence.

**Count Eight: Violation of the Restatement (Second) of Torts Section 552.**

130. Plaintiff incorporates by reference Paragraphs 1 to 129 as if fully set forth herein.

131. Defendant Webull negligently supplied false information which it intended to serve as guidance to Plaintiff, among other things, falsely stating that "opening rotation" was responsible for daily manipulation of the account values, multiple false account statements, and multiple false margin calls which it relied on in selling away the assets. Defendant Webull failed to exercise reasonable care and competence in supplying the false information, and disregarded account data and data supplied by Plaintiff that ought to have warned it of the falsity of its information.

132. Plaintiff relied on the false information, Defendant Webull knew and intended that Plaintiff relied on the false information, and sold off portfolio assets based on the false information.

133. Plaintiff was injured and suffered damages as a direct and proximate result of Defendant Webull's failure to exercise reasonable care in supplying and acting based on the false information.

### PRAYER FOR RELIEF

Wherefore Plaintiff respectfully requests that this Court enter judgment:

A. Finding that the MM Defendants violated federal securities laws, the Computer Fraud and Abuse Act, the Sherman Antitrust Act, violated Plaintiff's right to Privacy, and Maryland State Law, as alleged herein;

B. Finding that Defendant Webull was negligent in the discharge of its brokerage services, violated the Restatement (Second) of Torts § 552, breached fiduciary duty, violated federal securities and Maryland State Laws, as alleged;

C. Ordering MM Defendants to pay damages as a result of their unlawful conducts, including actual damages of $1,000,000 or the amount to be determined at the trial; treble damages and other reliefs pursuant to the Clayton Act § 4, 15 U.S.C. § 15; damages for invasion of privacy and infliction of emotional distress, and punitive damages in an amount to be determined at trial;

D. Ordering the Defendant Webull to pay damages as a result of its unlawful conducts, including the actual damages of $1,000,000 or the amount to be determined at the trial; treble and punitive damages in an amount to be determined at trial;

E.  Ordering permanent injunctive relief against MM Defendants from further violations;

F.  Awarding reasonable attorney's fees and costs together with all judgment interests;

G.  Granting such other and further relief as the Court deems just and appropriate.

I, Judekenneth Maduka Orji, affirm under the penalty of perjury that the foregoing is true

to the best of my personal knowledge and belief.

/s/Judekenneth Maduka Orji/s/*

Dated July 19, 2024                                        Judekenneth Maduka Orji
*The undersigned Counsel hereby certifies that he has a signed copy of the foregoing document
available for inspection at any time by the court or a party to this action

Respectfully submitted,
OGBUEHI OMENA ONWEZI, LLC
/s/ G. Emeka Onwezi

_____

By:     G. Emeka Onwezi, Fed. Bar No.: 16008
9701 Apollo Drive, Suite 100
Upper Marlboro, Maryland 20774
(301) 281-0030 (Telephone)
(240) 281-0030 (Facsimile)
geo@onestopadvocate.com
Counsel for the Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands jury trial.

/s/ G. Emeka Onwezi

_____

G Emeka Onwezi

CERTIFICATE OF SERVICES

I HEREBY CERTIFY that on July 19, 2024, a copy of the foregoing Second Amended
Complaint and Request for Jury Trial was filed and served via CM/ECF, on all counsels on record.

/s/ G. Emeka Onwezi

_____

G Emeka Onwezi