**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

JUDEKENNETH MADUKA ORJI,

               Plaintiff,

   vs.

CITADEL SECURITIES, LLC, et al.,

              Defendants.

Case No. 8:23-cv-02986-LKG

**DEFENDANT WEBULL FINANCIAL LLC'S MEMORANDUM OF LAW IN SUPPORT**

**OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**LOWENSTEIN SANDLER LLP**
Doreen M. Edelman
Rachel Maimin
Markiana Julceus
Cassandra Essert
2200 Pennsylvania Avenue NW
Washington, D.C. 20037

*Counsel for Webull Financial LLC*

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE CASE................................................................................................2

I. Webull's Contracts with Plaintiff...............................................................................2

II. The Alleged "Conspiracy" Against Plaintiff..............................................................3

III. Webull Investigates Plaintiff's Allegations................................................................4

IV. This Lawsuit ...............................................................................................................6

ARGUMENT ..........................................................................................................................7

I. THE COMPLAINT MUST BE DISMISSED FOR WANT OF PERSONAL JURISDICTION. ........................................................................................................7

    A. Webull Is Not Subject To General Personal Jurisdiction In Maryland ..................8

    B. Webull Is Not Subject To Specific Personal Jurisdiction In Maryland..................8

II. THE COMPLAINT MUST BE DISMISSED IN ITS ENTIRETY BECAUSE IT FAILS TO STATE A CLAIM AGAINST WEBULL...............................................10

    A. Plaintiff's Securities Fraud Claims Fail As a Matter of Law (Count One)............11

        1. Plaintiff's Securities Fraud Claims Are Time-barred. ..................................11

        2. Plaintiff Failed to Allege Facts Stating a Plausible Securities Fraud Claim (Count One)..............................................................................................12

    B. Plaintiff Cannot State a Claim for Breach of Fiduciary Duty (Count Two). .........13

    C. The Second Amended Complaint Fails to State a Claim for Breach of Contract (Count Three)..........................................................................................................14

    D. Plaintiff Cannot State a Claim for Intentional Misrepresentation or Common Law Fraud (Counts Five and Four)........................................................................15

    E. The Second Amended Complaint Fails to Plead an Intentional Infliction of Emotional Distress Claim (Count Six). ................................................................16

    F. Plaintiff Cannot Establish a Claim of Professional Negligence (Count Seven). ...17

    G. Plaintiff Has Failed to Allege Facts Stating a Plausible Claim Under Restatement (Second) of Torts § 552. ....................................................................18

III. PLAINTIFF HAS WAIVED ANY CLAIM FOR DAMAGES AGAINST WEBULL....................................................................................................................19

CONCLUSION.......................................................................................................................20

Defendant Webull Financial, LLC ("Webull") respectfully submits this memorandum of law in support of its motion to dismiss the Second Amended Complaint filed by Plaintiff Judekenneth Maduka Orji ("Plaintiff"), pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## **INTRODUCTION**

Plaintiff, a licensed attorney and experienced day-trader, brings this action in a plain effort to shirk responsibility for trading and portfolio losses he suffered at his own hand.  Plaintiff's theory is bizarre, but simple: thirty different financial institutions purportedly conspired to manipulate the self-directed brokerage account he maintained with Webull by, among other things, hacking his computers, email accounts, network router, and telephone.

The gravamen of the Second Amended Complaint, insofar as Webull is concerned, is that Webull allegedly failed to adequately investigate his threadbare conspiracy allegations and that Webull allegedly failed to adequately do so.  Plaintiff also contends that Webull retaliated against him after he began demanding forensic analyses of his accounts.  The Amended Complaint asserts eight claims against Webull, stemming from the institution's so-called campaign against Plaintiff, including (1) violations of the Exchange Act; (2) breach of its fiduciary duties; (3) breach of contract; (4) fraud; (5) intentional misrepresentation; (6) intentional infliction of emotional distress; (7) professional negligence; and (8) violation of Restatement (Second of Torts) § 552. Assuming Plaintiff's implausible facts as true, all of the claims fail as a matter of law.

Plaintiff's Second Amended Complaint brims with conclusory and turgid allegations that cannot establish a single cause of action against Webull, let alone that Webull is subject to this Court's jurisdiction.  Accordingly, Plaintiff's Second Amended Complaint should be dismissed and, because no amendment would cure the Complaint's fatal deficiencies, the dismissal should be made with prejudice.

**STATEMENT OF THE CASE**

I.      **Webull's Contracts with Plaintiff**

Webull is an introducing broker-dealer that is incorporated in Delaware and maintains its principal place of business in New York.  (Second Am. Compl., July 22, 2024, ECF No. 133, ¶ 11; "Customer Account Agreement" attached hereto as Exhibit A to the Declaration of Doreen Edelman, Esq. ("Edelman Decl.") at 1; *accord* "Webull Margin Agreement" attached hereto as Exhibit B to the Edelman Decl. at 1.)  Plaintiff, a licensed attorney and experienced investor with accounts at TD Ameritrade and TradeStation, became Webull's customer in November 2020. (Second Am. Compl. ¶¶ 42–44.)

Upon signing up for an account with Webull, Plaintiff reviewed and agreed to be bound by the terms of three agreements: the "Customer Account Agreement;" the "Webull Margin Agreement;" and the "Webull Financial Options Agreement" (collectively "the Agreements"). (Edelman Decl. Exs. A–C.)[1]  There are three parties to the Agreements: (1) Plaintiff; (2) Webull; and (3) Apex Clearing Corporation.  (Edelman Decl. Exs. A–C.)  Webull, as noted above, is an introducing broker-dealer that "introduces securities transactions on behalf of [its] Customer[s], which transactions are cleared through [its customers], whether one or more."  (Edelman Decl. Ex. B at 1.)  Apex Clearing Corporation ("Apex") is Webull's clearing broker and, in that capacity, cleared Plaintiff's trading activity, maintained custody of account assets, collected and distributed funds on behalf of Webull, provided statements to Plaintiff, and performed other traditional clearing services.  (Edelman Decl. Ex. A § 6 and § 6(a).)

The parties' rights and obligations under the Agreements are clear.  Section three of the Customer Account Agreement granted Apex the discretion to take several actions in response to

---

[1]  The Customer Account agreement and Webull Margin Agreement are each governed by Texas law.  (Edelman Decl. Ex. A § 15; Edelman Decl. Ex. B § 20.)

not only Plaintiff's breach of that "or any other agreement with [Apex]," but also where Plaintiff "fail[ed] to pay for securities and other property or to deliver securities and other property sold."

(*Id.* § 3.)  Apex could:

> Sell any or all securities and other property held in any of [Plaintiff's] accounts (either individually or jointly with others), cancel or complete any open orders for the purchase or sale of any securities and other property, and/or borrow or buy in-- in any securities and other property required to make delivery against any sale, including a short sale, effected for [Plaintiff], *all without notice or demand for deposit of collateral, other notice of sale or purchase, or other notice or advertisement, each of which [wa]s expressly waived by [Plaintiff]* . . .

(*Id.* (emphasis added).)

Apex also reserved the right to refuse to execute any transactions on Plaintiff's behalf "at any time and for any reason," notwithstanding the fact that Plaintiff's brokerage accounts were self-directed.

(*Id.*; *see* Second Am. Compl. ¶¶ 44, 49.)

> Finally, the Webull Financial Options Agreement contained the following release:

> *I will not hold [Webull and Apex] responsible for the availability, accuracy, timeliness, completeness, or security of trading securities through [Webull's and Apex's] platform.*  I therefore agree that [Webull and Apex] are not responsible for any losses I incur (meaning claims, damages, actions, demands, investment losses, or other losses, as well as any costs, charges, attorneys' fees, or other fees and expenses) in relation to this functionality.  Furthermore, I shall be responsible for all expenses incurred by you, including reasonable attorneys' fees in enforcing any provision of or collecting any amounts due you under this agreement.

(Edelman Decl. Ex. C § 21 (emphasis added).)

## II.     The Alleged "Conspiracy" Against Plaintiff

In addition to being a licensed attorney, experienced investor, and Webull customer, Plaintiff is an active participant in "Internet finance forums."   (Second Am. Compl. ¶ 42.) Plaintiff's participation on these forums allegedly triggered the attention of Webull's co-defendants—thirty financial institutions that he describes as "market makers" of "manipulation."

(*Id.*)  Plaintiff contends that once Webull's co-defendants (collectively described as the "MM

Defendants") began following his online postings, they "conspired to target and manipulate his portfolio in order to punish him for his views." (*Id.* ¶¶ 2, 4, 42, 44.) The first step in the MM Defendants' alleged conspiracy was to identify Plaintiff's securities by "stalking" his transactions. (*Id.* ¶ 43.) Plaintiff observed the "stalking" sometime before September 1, 2021. (*See id.* ¶ 43.) He later, around September 7, 2021, "received email and text messages purporting to be from Google, Inc.," that were used to reset his Gmail account's password. (*Id.* ¶ 45.) Plaintiff assumes that these actions were taken by the MM Defendants, to "obtain financial records and specific details of his brokerage accounts, use the data to fix quotations, gamify prices, trade in lockstep, and manipulate the Relevant Securities . . . to create losses and defraud him." (*Id.* ¶ 43; *see also id.* ¶¶ 2, 45, 47–58, 74, 86–87, 96.)

Plaintiff downloaded the Webull desktop app and began using it to monitor his portfolio on September 15, 2021. (*Id.* ¶ 49.) According to Plaintiff, within a second (9:30:04 a.m. and 9:30:05 a.m.), the total account value of his Webull portfolio "was sold down to $51,315.19, with $-115,668.87 in losses." (*Id.*) Plaintiff attributed this fluctuation to the MM Defendants; "[t]he MM Defendants would continue to use their privileges as market makers to artificially set the Bid/Ask price quotation of the Relevant Options Symbols/Cusips to control and systematically erode [his] Webull portfolio balance." (*Id.*) In fact, Plaintiff began blaming any negative fluctuations in his Webull account portfolio to the MM Defendants, finding no fault whatsoever in his financial prowess and investing abilities. (*See, e.g.*, ¶¶ 46, 53–54, 67.)

## III.    Webull Investigates Plaintiff's Allegations

Webull eventually became the focus of Plaintiff's allegations. Plaintiff, without explanation or supporting facts, asserts that Webull's technology was unable to properly calculate the portfolio asset values to discount the arbitrary figures" quoted by the MM Defendants "in furtherance of the manipulative scheme." (*Id.* ¶ 54.) Plaintiff also contends, without explanation,

that Webull "arbitrarily miscalculate[d his] account values, and randomly displayed net asset values" and operated "faulty technology that was unable to properly calculate the account values." (*Id.* ¶¶ 59–60.)

Plaintiff brought his misconceptions to and had them clarified by Webull on multiple occasions. (*Id.* ¶¶ 54, 59–60.) Plaintiff contacted Webull on October 19, 2021, October 27, 2021, and November 11, 2021 to complain that because of the MM Defendants' manipulations, his portfolio values "were not being updated;" in other words, showing the balances *he* believed they should show. (*Id.* ¶¶ 54, 59.) Members from Webull's customer support team "replied that there was no problem." (*Id.* ¶ 59.) Plaintiff, undeterred, continued to contact Webull's customer support and, when he did not receive the response he wanted, began inferring from undefined "*suggest*[*ions*] that . . . Webull's [t]echnology wrongfully sold off Plaintiff's assets." (*Id.* ¶ 60 (emphasis added).)

Plaintiff next complained to Webull about the MM Defendants' "market manipulation" on November 26, 2021. (*Id.* ¶ 61.) According to Plaintiff, a Webull employee responded that same day that the company would "begin to conduct an investigation on [his] behalf." (*Id.* ¶ 62.) Webull asked Plaintiff to send videos, photos, and other evidence as part of its investigation; a request with which Plaintiff complied. (*Id.*) Two days later, on December 1, 2021, a Webull options account supervisor contacted Plaintiff. (*Id.* ¶ 64.) The supervisor—like several Webull employees before him—tried in vain to explain that Webull's technology was not responsible for the fluctuations in Plaintiff's portfolio. (*See id.*) The supervisor's "initial suspicion was that 'Options Opening Rotation' could have been responsible for the portfolio value swings." (*Id.*) Another Webull employee surmised that "the fluctuations in the account value was [sic] because Plaintiff sold illiquid leaps as covered calls." (*Id.* ¶ 66 n.10.) Plaintiff, an admittedly "unsophisticated investor,"

insisted no explanation offered by Webull could be true and rejected Webull's January 4, 2022 conclusion that there was no evidence of manipulation.  (*Id.* ¶¶ 64, 75; *see also id.* ¶ 42.)  Plaintiff decided that Webull "did not watch the videos sent by Plaintiff at [Webull's] request," and that Webull's earlier "representation" that it was still researching his complaints "was false."  (*Id.* ¶¶ 64–65.)

Plaintiff's portfolio was subject to multiple margin calls before, during, and after Webull's investigation.  (*Id.* ¶¶ 75–82.)  Because Plaintiff's account did not maintain minimum capital requirements, Apex on multiple occasions invoked its right to sell securities held in Plaintiff's account without notice.  (*See id.* ¶¶ 75–78, 81, 83–84; *see also* Edelman Decl. Ex. A § 3(ii) (permitting Apex to sell plaintiff's securities, without notice to plaintiff, in the event of plaintiff's failure to pay for or deliver securities sold).)  Plaintiff demanded that Webull conduct "a forensic audit" of his portfolio on January 31, 2022 and "return [his] account to the position it would have been had its technology not interfered with the values from December 3, 2021."  (Second Am. Compl. ¶¶ 82, 84.)  According to the Second Amended Complaint, Webull "continued to issue . . . margin calls while retaining portfolio assets" and, by June 15, 2023, "[t]here were no margin debts on [Plaintiff's] account."  (*Id.* ¶ 84.)

### IV.    This Lawsuit

Rather than acknowledge his sole responsibility for his financial morass, Plaintiff continued his blame campaign by suing Webull and the MM Defendants on November 1, 2023.  (ECF No. 1.)  Plaintiff first amended his Complaint on January 8, 2024, and filed the operative Second Amended Complaint on July 19, 2024.  (ECF No. 133.)

Plaintiff's Second Amended Complaint demands actual damages of $1,000,000 and punitive damages against Webull in connection with eight claims for relief: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) and (c); (2) breach of fiduciary duty; (3) breach of

contract; (4) common law fraud; (5) intentional misrepresentation; (6) intentional infliction of emotional distress; (7) professional negligence; and (8) violation of Restatement (Second) of Torts Section 552.  (*Id.* ¶¶ 114–132, Prayer for Relief ¶ D.)  As Webull demonstrates below, the Second Amended Complaint's factual allegations, even if presumed true for purposes of this motion, do not establish this Court has personal jurisdiction over Webull.  Moreover, Plaintiff's allegations do not come close to stating any of the above claims for relief.

## **ARGUMENT**

### I.   **THE COMPLAINT MUST BE DISMISSED FOR WANT OF PERSONAL JURISDICTION.**

Federal Rule of Civil Procedure 12(b)(2) allows a litigant to move to dismiss a pleading because of a lack of personal jurisdiction.  The Court's assertion of personal jurisdiction over Webull must be compatible with the Fourteenth Amendment's Due Process Clause.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011).  The main focus of this inquiry is "the defendant's relationship to the forum state." *Bristol Myers Squibb v. Superior Court*, 582 U.S. 255, 262 (2017).  Specific jurisdiction, on the other hand, requires that a suit "aris[e] out of or relat[e] to the defendant's contacts with the ***forum***." *Id.* (alterations in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).  An assertion of specific jurisdiction passes constitutional muster only if "'the in-state activities of the corporate defendant 'ha[d] not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on.'" *Daimler*, 571 U.S. at 126 (quoting *Int'l. Shoe Co. v. State of Wash., Off. of Unempl. Compen. and Placement*, 326 U.S. 310, 317 (1945) (alterations in original).)

It is Plaintiff's burden to establish that this Court has personal jurisdiction over Webull, and Plaintiff has not even attempted to meet it.  *See Glynn v. EDO Corp.*, 641 F. Supp. 2d 476, 485 (D. Md. 2009) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).  None of the Second

Amended Complaint's fantastical allegations establish general or specific personal jurisdiction over Webull.

### A.   <u>Webull Is Not Subject To General Personal Jurisdiction In Maryland</u>

The Second Amended Complaint's own allegations demonstrate that Webull is only subject to general personal jurisdiction in Delaware or New York.  General jurisdiction in particular applies only when a defendant is "at home." *Bristol Myers Squibb*, 582 U.S. at 262.  The general jurisdiction inquiry demands "an appraisal of a corporation's activities in their entirety" because an entity like Webull, which "operates in many places can scarcely be deemed at home in all of them." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017).  Accordingly, a corporation like Webull is "at home" for general jurisdiction purposes in the state of its principal place of business or its state of incorporation. *Daimler*, 571 U.S. at 137.  The Second Amended Complaint correctly states that Webull was organized in the state of Delaware and maintains a principal place of business in the state of New York.  (Second Am. Compl. ¶ 11.)  Thus, Webull is not subject to general personal jurisdiction in Maryland. *See Daimler*, 571 U.S. at 137; *see also Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 134 (4th Cir. 2020) (finding lack of general personal jurisdiction where defendant was not incorporated in or had its principal place of business in Maryland, and plaintiffs did not allege any facts distinguishing defendant's relationship with the forum state from any other state where defendant did business).

### B.   <u>Webull Is Not Subject To Specific Personal Jurisdiction In Maryland</u>

The Complaint is also wholly devoid of allegations sufficient to establish personal jurisdiction.  Specific jurisdiction over a defendant aligns with due process only if the nonresident defendant has purposefully made minimum contacts with the forum state. *Burger King Corp. v. Rudzewics*, 471 U.S. 462, 475–76 (1985).  Minimum contacts may consist of purposeful availment, which focuses on the defendant's conduct and is satisfied when a defendant purposefully exploits

the privilege of doing business in a jurisdiction.  *Id.*  At all times, however, the exercise of specific jurisdiction must be fair and reasonable.  *See id. at 485–86*; *see also* Md. Cts. & Jud. Proc. Code Ann. § 6-103.  The Second Amended Complaint lacks any facts establishing specific personal jurisdiction over Plaintiff in Maryland.

Plaintiff's contacts with Maryland are far too attenuated to confer jurisdiction on it in this forum.  Webull operates no facility in Maryland, owns no property in Maryland, has no bank account in Maryland, and has not solicited customers or clients in Maryland.  The mere fact that Plaintiff resides in Maryland is insufficient to establish specific jurisdiction; critically, specific jurisdiction turns on "whether the ***defendant's*** contacts with the forum state provide the basis for the suit." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) (emphasis added).  Here, the closest Plaintiff gets to referencing any activity by Webull in Maryland is alleging that Webull "transact[s] substantial business in the District . . . through the Internet" and that "[Webull's] FINRA Broker Check Report states that it was registered and approved to conduct business in Maryland on [January 26, 2018]."  (Second Am. Compl. ¶¶ 8, 11.)  Neither fact gives rise to specific personal jurisdiction.  "Merely running a website that is accessible in all 50 states, but that does not specifically target the forum state, is not enough to create the 'minimum contacts' necessary to establish personal jurisdiction." *Admar Int'l., Inc. v. Eastrock, LLC*, 18 F.4th 783, 785 (5th Cir. 2021); *accord Shamsuddin v. Vitamin Rsch. Prods.*, 346 F. Supp. 2d 804, 813 (D. Md. 2004) (minimum contacts not established where corporate defendant's "only contacts with Maryland are a commercial, interactive website which is accessible to Maryland residents" and two sales).  Because Webull's alleged contacts with Maryland are not of such a "quality and nature" that the exercise of personal jurisdiction over it would satisfy due process, the Second Amended Complaint's claims against Webull must be dismissed.  *Shamsuddin*, 346 F. Supp. 2d at 813.

## II.   THE COMPLAINT MUST BE DISMISSED IN ITS ENTIRETY BECAUSE IT FAILS TO STATE A CLAIM AGAINST WEBULL. [2]

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This facial-plausibility standard is forgiving, but not toothless—it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Nor does it require the Court to credit "legal conclusion[s] couched as . . . factual allegation[s]" or "naked assertions devoid of further factual enhancement." *Id.* (citations and internal quotations omitted).

The determination of whether a complaint states a plausible claim is context-specific, requiring "[a] reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making its assessment, the Court may consider, in addition to Plaintiff's factual averments, any written instrument on which Plaintiff necessarily relies, regardless of whether it is attached to the Second Amended Complaint. *Baltimore Scrap Corp. v. Executive Risk Specialty Ins.,* 388 F. Supp. 3d 574, 585 (D. Md. 2019); *accord Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 2d 919, 926 (N.D. Tex. 2014) ("when a plaintiff['s] claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim").  "Legal conclusions masquerading

---

[2]  The customer agreements that govern the relationship between Plaintiff and Webull contain a Texas choice-of-law provision.  Such law thus governs Plaintiff's claims.  Despite the express choice-of-law provision, Webull anticipates that Plaintiff will argue that Maryland law applies. For the Court's convenience, Webull addresses the law in both jurisdictions and demonstrates that even if Maryland law governed, the result would be the same—Plaintiff's claims are improperly pled and must be dismissed.

as factual averments, however, may not be taken into account." *Trivedi v. N.Y.S. Unified Ct. System Off. of Ct. Admin.*, 818 F. Supp. 2d 712, 734 (S.D.N.Y. 2011) (citing *Twombly*, 550 U.S. at 555).

## A.  Plaintiff's Securities Fraud Claims Fail As a Matter of Law (Count One)[3]

### 1.  Plaintiff's Securities Fraud Claims Are Time-barred.

Section 10(b) of the Securities Exchange Act and Rule 10b-5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  A plaintiff seeking to recover for violations of Section 10(b) and Rule 10b-5 bears the burden of proving: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) causation.'" *Id.* (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)).  For liability to exist, there must be a "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (citation and internal quotations omitted).  Moreover, Exchange Act claims must be brought within "2 years after the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b)(1); *see also Landsberger v. Martek Biosciences Corp.*, No. 09-cv-3389, 2010 WL 3038947, *3 (D. Md. July 30, 2010) (dismissing Exchange Act claims as time-barred).

In this case, Plaintiff filed the original complaint on November 1, 2023.  But Plaintiff's own allegations reveal that he was aware of the purported fraud by Webull more than two years

---

[3]  In the interest of efficiency, Webull joins in and adopts the arguments raised by its co-defendants with respect to Count 1 of the Complaint, including that Plaintiff did not rely on an efficient market free of manipulation; that Plaintiff has failed to plead any manipulative activity; and that Plaintiff has not adequately pled economic loss, causation, and scienter.  *See* ECF No. 134, MM Defs.' Br. at 7–14.

before filing.  Plaintiff claims, for example, that on October 19, 2021 and October 27, 2021, he called Webull and complained about his portfolio values not being updated.  (Second Am. Compl. ¶ 54.)  He also, on October 21, 2021, complained to the Federal Trade Commission Internet Crimes Unit and the FBI, "alleging identity theft and appropriation."  (*Id.* ¶ 55.)  Because over two years elapsed between Plaintiff's "discovery" of Webull and the MM Defendants' alleged scheme, Plaintiff's Exchange Act claims are time-barred.

### 2. Plaintiff Failed to Allege Facts Stating a Plausible Securities Fraud Claim (Count One).

Plaintiff's Exchange Act claims should be dismissed even if the Court finds the time-bar does not apply.  Plaintiff's securities fraud claim must satisfy not only the general pleading standards of Federal Rule of Civil Procedure 8(a), but the heightened requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) demands that a plaintiff plead the circumstances of fraud with particularity.  In other words, Plaintiff must plead specific facts on "the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud—the 'who, what, where, why, and when.'"  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 346, 368 (D. Md. 2004).  Plaintiff alleges Webull made material misrepresentations by (1) providing false and inaccurate portfolio values; (2) "deceiv[ing] Plaintiff by committing to investigate his complaint when it knew it would not provide the resources for the investigation"; (3) providing false margin notices; and (4) giving false and misleading information on the restoration of Plaintiff's assets.  (Second Am. Compl. ¶ 115; *see also id.* ¶¶ 62–65, 77–78.)

None of this can sustain a securities fraud claim.  To begin, the above allegations are conclusory, and thus should not be accepted as true by the Court.  *See Iqbal*, 556 U.S. at 678.  Plaintiff also fails to clear Rule 9(b)'s hurdle because he does not allege—nor can he—that Webull

made a single misrepresentation, let alone a material misrepresentation.  Plaintiff's own allegations establish that Webull investigated his grievances.  (*See* Second Am. Compl. ¶¶ 42, 59–60, 62, 64, 66 n.10.)  Furthermore, while Plaintiff may have *believed* the portfolio values and margin notices issued by Webull were false, he has made no contentions showing that his belief was based in fact, let alone any specific statements or omissions by Webull.  Plaintiff's Exchange Act claims should therefore be dismissed.

### B.   Plaintiff Cannot State a Claim for Breach of Fiduciary Duty (Count Two).

Plaintiff's breach of fiduciary duty claims also fail as a matter of law.  Under both Maryland and Texas law, to establish a breach of fiduciary duty as an independent cause of action, a plaintiff must plead and show (1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary.  *Plank v. Cherneski*, 231 A.3d 436, 466 (MD. Ct. App. 2020); *accord First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (listing four elements: (1) a fiduciary relationship; (2) breach of duty; (3) causation; and (4) damages).

Plaintiff's breach of fiduciary duty claim should be dismissed because he has not met his burden of establishing he had a fiduciary relationship with Webull.  *Plank*, 231 A.3d at 466; *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004).  "A fiduciary relationship is an extraordinary one that the law does not recognize lightly."  *Mary E. Bivins Found. v. Highland Capital Mgmt.*, 451 S.W.3d 104, 113 (Tex. App. 2014).  As a general matter, a broker-dealer like Webull "has no duty to determine the suitability of an investor [like Plaintiff's] trades or to prevent the customer from losing money in a non-discretionary account."  *Dunhem v. SunTrust Banks, Inc.*, No. CV AW-04-1016, 2006 WL 8457036, at *3, *8 (D. Md. Mar. 23, 2006).  Brokers of non-discretionary accounts—also known as self-directed accounts—serve "only to fulfill the mechanical, ministerial requirements of the purpose or sale of the security;" in other words, to

execute transactions or orders consistent with a client's instructions. *In re Enron Corp. Secs.*, 238 F. Supp. 3d 799, 843 (S.D. Tex. 2017) (citation and internal quotations omitted); *see also Dunhem*, 2006 WL 8457036, at *3, *8. Thus, no fiduciary relationship is created between a broker and its client if the client's account is, as here, non-discretionary. *In re Enron*, 238 F. Supp. 3d at 843. Here, the Second Amended Complaint lacks any allegations showing that there was a breached fiduciary relationship with Webull, a broker-dealer that exclusively offers self-directed accounts. This claim should thus likewise be dismissed.

C. **The Second Amended Complaint Fails to State a Claim for Breach of Contract (Count Three).**

A breach of contract claim requires the existence of a contractual obligation, breach, and damages under both Maryland and Texas law. *Transamerica Premier Life Ins. v. Selman & Co.*, 401 F. Supp. 3d 576, 596 (D. Md. 2019); *Kim v. Nationwide Mut. Ins.,* 614 F. Supp. 3d 475, 492 (N.D. Tex. 2022). Both jurisdictions also require a plaintiff to "plead which provision of the contract the defendant violated" to survive a Rule 12(b)(6) motion to dismiss. *Kim*, 614 F. Supp. 3d at 492; *Selman & Co.*, 401 F. Supp. 3d at 596 ("Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant'"). Here, the Second Amended Complaint is filled with conclusory allegations that Webull "failed to perform according to contract" and breached its brokerage agreements with Plaintiff. (Second Am. Compl. ¶¶ 6, 78, 120–121.) Plaintiff has not, however, identified a single provision of the Agreements Webull purportedly breached. Failure to satisfy this basic requirement warrants dismissal of Plaintiff's breach of contract claim. Nor could Plaintiff identify such a requirement, in any event, as Webull upheld each and every of the limited obligations it owed to Plaintiff.

**D.** **Plaintiff Cannot State a Claim for Intentional Misrepresentation or Common Law Fraud (Counts Five and Four).**

Plaintiff asserts a cause of action for "intentional misrepresentation," but intentional misrepresentation is not an independent tort under Maryland or Texas law; it is the same as asserting a fraud claim. *Sass v. Andrew*, 832 A.2d 247, 261 (Md. App. Ct. 2003) ("Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." (citation and quotations omitted); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 671 (Tex. App. 1996) (intentional misrepresentation is "another name for common law fraud"). This alone warrants the dismissal of Count Five.

Plaintiff's common law fraud claim, Count Four, should likewise be dismissed. To succeed on a fraud claim under Maryland or Texas law, Plaintiff must plead and prove that Webull (1) made a false representation to Plaintiff; (2) knew the representation was false or was recklessly indifferent to its truth; (3) made the misrepresentation to defraud Plaintiff; (4) that Plaintiff relied on the misrepresentation, with the right to rely on it; and (5) that Plaintiff suffered a compensable injury resulting from the misrepresentation. *See Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1123 (Md. 1995); *see also Ernst & Young, L.L.P. v. P. Mut. Lif Ins.*, 51 S.W.3d 573, 577 (Tex. 2001). Plaintiff's pleading must also satisfy Rule 9(b)'s heightened pleading standard, outlined in Section II(A) above. *See Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 741–42 (N.D. Tex. 2014); *see also McCormick v. Medtronic, Inc.*, 101 A.3d 467, 492–93 (Md. Ct. Spec. App. 2014) (applying particularity standard in Maryland state court).

The Second Amended Complaint yet again fails to clear the "who, what, where, why and when" bar. *See In re Royal Ahold*, 351 F. Supp. 2d at 349, 368 (citation and internal quotations omitted). Plaintiff makes several conclusory and general allegations that Webull made "multiple false statements and misrepresentations to Plaintiff which it knew" were false to deceive and

defraud Plaintiff.  (Second Am. Compl. ¶ 123; *see id.* ¶¶ 63–65, 78–82.)  These allegations are not only farfetched, and thus should not be accepted as true—they also fail to outline any misrepresentation or omission by Webull, must less one on which Plaintiff justifiably relied. Plaintiff's own feelings are ostensibly his only basis for believing the portfolio values and reasoning presented to him by Webull were untrue.  (*See, e.g.*, *id.* ¶ 64 ("Plaintiff replied that opening rotation could not just repeatedly target the account and affect it in a particular way on a daily basis, or cut the account in half with each opening.").  That does not mean that Webull's communications with Plaintiff were lies.

Plaintiff's fraud claims fail under Maryland law in particular for yet another reason: Maryland law rarely permits fraud claims based on a breach of contract.  *Sass*, 832 A.2d at 265.  A defendant's alleged failure to fulfill a promise generally only gives rise to a claim for breach of contract.  *See id.*  While Maryland courts have made exceptions when a defendant executed a contract never intending to honor it, Plaintiff's own allegations establish that exception does not apply here.  *See id.*  Plaintiff's common law fraud claim must therefore be dismissed.

**E.**      **The Second Amended Complaint Fails to Plead an Intentional Infliction of Emotional Distress Claim (Count Six).**

The elements of an intentional infliction of emotional distress ("IIED") claim under Maryland and Texas law overlap.  An IIED plaintiff must plead and prove (1) that the defendant's conduct was reckless or intentional; (2) the defendant conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress suffered by the plaintiff is severe.  *Carter v. Aramark Sports & Ent. Servs.*, 835 A.2d 262, 282 (Md. App. Ct. 2003); *accord Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998).  Because "[t]he standard for actionable conduct under this tort is exacting and stringent," *Carter*, 835 A2d at 284, Maryland courts require plaintiffs to allege and

prove the elements of IIED with specificity, *Foor v. Juvenile Servs. Admin*, 552 A.2d 947, 959 (Md. Ct. Spec. App. 1989).  Conduct meets the "extreme and outrageous" test only if it is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (holding allegations that usher engaged in scheme to reuse discarded disposable yogurt cups was not "extreme and outrageous"); *accord Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 455 (Tex. 2004).

Here, the Complaint contains no specific facts to support any element of this claim, let alone that Webull's conduct was "extreme and outrageous."  Even if this claim were adequately pled—which it is not—it is barred by both Maryland and Texas law's economic loss rule, which bars tort claims when plaintiffs seek to recover purely economic losses. *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 647 A.2d 405, 410 (Md. 1994); *accord LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 244 (Tex. 2014).  Finally, the Texas Supreme Court has decreed IIED a legal mechanism restricted in scope, reserved for "the limited purpose of allowing recovery in those rare instances in which . . . the [plaintiff] has no other recognized theory of redress." *Hoffmann-La Roche*, 144 S.W3d at 447.  The claim is designed "'to supplement existing forms of recovery by providing a cause of action for egregious conduct' that might otherwise go unremedied." *Id.* (citation omitted).  This is not such a case.  Plaintiff's IIED claim must therefore be dismissed.

### F.    Plaintiff Cannot Establish a Claim of Professional Negligence (Count Seven).

Plaintiff must plead and prove four elements to sustain his professional negligence claim: (1) that Webull owed him a duty; (2) that Webull breached that duty; (3) the breach caused injury to Plaintiff; and (4) that the breach resulted in damages. *Neal v. United States*, 599 F. Supp. 3d 270, 290–91 (D. Md. 2022); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 660 (S.D. Tex. 2008).  In this case, Plaintiff's professional negligence claim suffers the same deficiencies as his claim for breach

of fiduciary duty.  (*See supra* Section II(B)).  Webull, as a broker-dealer that merely makes a security available to consumers, has no duty to Plaintiff, let alone a responsibility to warn that an investment may be imprudent.  *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1038 (4th Cir. 1997).  Plaintiff also fails, unsurprisingly, to explain how he was "injured and suffered losses as a direct result" of Webull's negligence.  (Second Am. Compl. ¶¶ 127–29.)  Put simply, Plaintiff's conclusory assertions that Webull "owe[d] Plaintiff a duty of professional care as a broker-dealer" and caused him harm cannot sustain a professional negligence claim.  Even if they could, Plaintiff's professional negligence claim is nevertheless barred by the economic loss rule.  *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 130 A.3d 1024, 1038, *aff'd*, 155 A.3d 445 (2017) (finding professional negligence claims for purely economic losses barred).  This claim, too, must be dismissed.

## G.      Plaintiff Has Failed to Allege Facts Stating a Plausible Claim Under Restatement (Second) of Torts § 552.

Restatement (Second) of Torts § 552 provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Texas courts follow § 552 in imposing liability for negligent misrepresentation, but limit liability "to persons (1) whom the maker of the representation intends to benefit or (2) to a limited group of persons for whose benefit the maker intends to supply the information or knows that the recipient intends to supply it."  *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 280 (N.D. Tex. 1990).  "[A] plaintiff's standing . . . depends on whether a defendant had 'knowledge of the identity of the party to whom the information is provided and actual knowledge of the purpose for which the information is being supplied.'"  *Barraza v. Bank of Am.*, No. EP-12-CV-35-KC, 2012 WL

12886438, at *5 (W.D. Tex. Aug. 13, 2012) (quoting *Ervin v. Mann Frankfort Stein & Lipp CPAs, L.L.P.*, 234 S.W.3d 172, 177 (Tex. App. 2007)).  Maryland courts, on the other hand, have not applied § 552 in this context.  Here, Plaintiff's § 552 claim fails because he has not plausibly alleged—nor can he prove—that the information Webull published was false.  Plaintiff has also failed to plausibly allege that Webull knew and intended that Plaintiff in particular would rely on "false" information.  Thus, this claim must also be dismissed.

### III.   PLAINTIFF HAS WAIVED ANY CLAIM FOR DAMAGES AGAINST WEBULL.

Even if Plaintiff could state a single cause of action against Webull—which he cannot— the terms of his agreements with Webull and Apex bar his recovery.  In Maryland, exculpatory contractual clauses are generally valid.  *Mowery v. Smith*, No. 19-CV-845-JMC, 2019 WL 2772508, at *3 (D. Md. July 2, 2019).  So long as the provision "clearly, unequivocally, specifically, and unmistakably expresses [a plaintiff's] intention to exculpate the [defendant]," the waiver is enforceable.  *Adloo v. H.T. Brown Real Est., Inc.*, 686 A.2d 298, 305 (1996).  The same logic applies to cases relying on Texas law.  *See, e.g.*, *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 416 (Tex. 2022), *reh'g denied* (Sept. 2, 2022).

Here, Plaintiff agreed that he "will not hold [Webull and Apex] responsible for the availability, accuracy, timeliness, completeness, or security of trading securities through [Webull's and Apex's] platform."  (Edelman Decl. Ex. C § 21.)  The same damages waiver states that Plaintiff "agree[s] that [Webull and Apex] are not responsible for any losses I incur (*meaning claims, damages, actions, demands, investment losses, or other losses* . . .) in relation to this functionality." (*Id.*)  Thus, even if Plaintiff's claims were accepted as true, the recovery he seeks is barred as against Webull.

## **<u>CONCLUSION</u>**

For these reasons, Webull requests that the Court grant its motion, and the operative Complaint be dismissed with prejudice and in its entirety.

Respectfully submitted,

By: */s/ Doreen M. Edelman*
Doreen M. Edelman
Rachel Maimin
Markiana Julceus
Cassandra Essert

**LOWENSTEIN SANDLER LLP**
*Attorneys for Defendant Webull Financial, LLC*

Dated: August 23, 2024